(No. 15261.—Decree affirmed.)

ELMER E. HAGLER, Appellant, *vs.* LEN SMALL, Governor, *et al.* Appellees.

*Opinion filed April 11, 1923.*

1. CONSTITUTIONAL LAW—*what is meant by a majority vote of electors voting for members of General Assembly.* Section 18 of article 4 of the constitution, requiring an affirmative vote by a majority of the voters voting at an election for members of the General Assembly in order to authorize the State to borrow money and to levy a tax to pay the debt, does not require a majority of all the votes cast, which under minority representation would be three times the number of voters, but only requires a majority of the voters.

2. SAME—*the Soldiers' Compensation act does not include unrelated subjects.* The Soldiers' Compensation act, providing for the creation of a debt of $55,000,000 and for an annual tax to pay the same, that the fund shall be paid out in accordance with the State Finance act and for creation of a Service Recognition Board, does not include unrelated subjects and does not violate the constitutional provision requiring a yea and nay vote upon separate bills; nor does the provision authorizing the submission, at the same election, of the propositions to authorize the creation of the debt and the levy of a tax to pay the same violate the constitutional provision for freedom of elections.

3. SAME—*when act does not violate constitutional provision as to title.* The constitutional provision that no act shall embrace more than one subject, which shall be expressed in the title, is to prevent the joining in one act of unrelated subjects, and is not violated where all the provisions of the act, however diverse, are germane to the general subject, which is stated in the title.

4. SAME—*Soldiers' Compensation act does not violate constitutional provision relating to amendments.* There is no constitutional objection to incorporating in an act the provisions of another law by reference thereto, and the Soldiers' Compensation act does not violate the constitutional provision relating to amendments because it provides that the funds accruing under the act shall be payable in accordance with the provisions of the State Finance act.

5. SAME—*appropriation to private person is not prohibited by constitution.* Section 16 of article 4 of the constitution prohibits an appropriation for any purpose by a private law but it does not prohibit an appropriation to a private person.

6. SAME—*the Soldiers' Compensation act does not grant extra compensation to servants or agents of the State.* The Soldiers' Compensation act does not violate section 19 of article 4 of the constitution, providing that the General Assembly shall never grant extra compensation to any public officer, agent, servant or contractor after service has been rendered, as the beneficiaries of the act are not officers, agents, servants or contractors.

7. SAME—*legislature has all powers not prohibited by constitution.* The legislature possesses all powers not prohibited by the limitations of the constitution, and being intrusted with sovereign powers for the welfare of the people it must also be intrusted with the means of executing or carrying out those powers.

8. SAME—*sections 18, 19 and 20 of article 4 of State constitution do not limit power of State to assist national government in time of war.* The provisions of sections 18, 19 and 20 of article 4 of the State constitution do not limit the right or power of the State to assist the national government in the prosecution of its wars by contributions of money or by assuming any responsibilities connected with such wars, and the United States, when in war, is not to be included within the designation "any public or other corporation or individual," used in section 20, but said section is intended to prevent loaning or extending the credit of the State to private enterprise or in aid of municipal corporations.

9. SAME—*when State is at war within meaning of section 18 of article 4 of constitution.* The State may be said to be at war, within the meaning of section 18 of article 4 of the constitution, when the United States is at war with a foreign power or rebellion exists within its borders and it has made legal requisition on the States for men or means to conduct war.

10. SAME—*taxing power cannot be used for private interest.* The power of the State legislature to levy and collect taxes rests upon the public character of the purpose for which such tax is to be levied, and it is the duty of the legislature to see that the taxing power is used for a public purpose and not for private interest.

11. SAME—*what may be regarded as a public purpose justifying levy of tax.* Whatever objects by long course of legislation have been considered necessary to the support and for the proper use of the government may be regarded as public purposes justifying the making of appropriations and the levying of taxes therefor; but the power of the State to expend money for public purposes is not limited to the narrow lines of necessity, and may include those objects which subserve the general wellbeing of society and the happiness and prosperity of the people.

12. SAME—*if purpose is public the legislature exercises taxing power in its discretion.* Where the purpose sought to be obtained is a public one and contains the elements of public benefit the legislature may use its discretion in exercising its power of taxation, and it may determine in the first instance whether or not the measure is for the public good, and the courts cannot interfere in the absence of a clear showing that the purported public purpose is but an evasion and that the purpose is, in fact, private.

13. SAME—*protection of the national government is a service rendered the State.* The citizenship of the several States is the citizenship of the Union, and the service which the citizen renders the national government in protecting it from its foes is a service rendered the State and makes such citizen a soldier of the State as well as of the nation, as that which tends to overthrow or defeat the national government tends to the defeat and downfall of the republican form of government guaranteed to the State by the Federal constitution.

14. SOLDIERS' COMPENSATION—*Soldiers' Compensation act provides a lawful expenditure for public purpose.* The Soldiers' Compensation act does not violate section 20 of article 4 of the constitution, prohibiting the State from giving or lending its credit to aid an individual or corporation, as the primary purpose of the act is to encourage the defense of the country in future conflicts, thereby promoting the public welfare of the State; and the fact that individuals are directly benefited by the payment of compensation provided in the act does not preclude the State from borrowing money and using its credit to further the primary public purpose for which the statute was enacted.

15. SAME—*State owes a moral obligation to citizens in service of national government in time of war.* The State owes a moral obligation to its citizens who, whether by induction or by enlistment, served the national government in the world war, as the protection of the national government is a service to the public welfare of the State.

16. WORDS AND PHRASES—*what constitutes a "moral obligation."* It is the essence of a moral obligation that it arise out of a state of facts appealing to a universal sense of justice and fairness though upon such facts no legal claim can be based.

CARTWRIGHT and DUNN, JJ., took no part.

APPEAL from the Circuit Court of Sangamon county; the Hon. ELBERT S. SMITH, Judge, presiding.

SHERMAN & BAINUM, for appellant.

EDWARD J. BRUNDAGE, Attorney General, and ALBERT
D. RODENBERG, (HARRY A. NEWBY, and HOWARD C.
KNOTTS, of counsel,) for appellees.

Mr. JUSTICE STONE delivered the opinion of the court:

Appellant, as a citizen and tax-payer, sought to enjoin
the appellees, as officers of the State and members of the
Service Recognition Board, from enforcing the provisions
of an act entitled "An act to provide payment of compen-
sation to certain persons who served with the military or
naval forces of the United States in the recent war with
Germany." To this end he filed his bill in the circuit court
of Sangamon county, alleging that the act is void in that
it violates certain provisions of the constitution of the
State. An answer was filed and a hearing had before the
chancellor, who found the issues of fact for the appellees
and dismissed the bill for want of equity. The cause comes
here for review.

The act in question consists of fifteen sections. Sec-
tion 1 provides that every person who served honorably in
active duty in the military or naval service of the United
States for a longer period than two months, and who was
enlisted, inducted, warranted or commissioned between
April 6, 1917, and November 11, 1918, and who was at
the time of entering such service a resident of this State,
and who had been honorably discharged from service or is
still in active service or retired, shall be entitled to receive
compensation of fifty cents for each day's service, not ex-
ceeding a total of $300. Section 2 provides for the payment
of such allowance to relatives of a deceased person entitled
thereto. Section 3 defines those not entitled to compensa-
tion, and section 4 prohibits the assignment of any right or
claim under the act. A Service Recognition Board, consist-
ing of the Governor, State Treasurer and Adjutant General,
is created by section 5 of the act. This section provides
that the board shall have complete charge and control of the

payments authorized by the act and of the formation of necessary rules for that purpose. Section 6 authorizes the employment of clerical help by the board, and section 7 limits the time in which application for compensation must be made to January 1, 1925. By section 8 bonds of the State in the amount of $55,000,000 are authorized for the purpose of providing funds for the payments under the act. This section requires that the funds when so derived shall be kept in a separate fund in the State treasury, to be known as the soldiers' compensation fund. The sum of $55,000,-000 is by section 9 appropriated to the Service Recognition Board, such appropriation to be paid out as provided in the State Finance act. By section 10 it is provided that if there be a surplus remaining in the soldiers' compensation fund after all payments provided for in the act have been made, such surplus may be expended by the Service Recognition Board for the relief of veterans of the world war and their families, in such manner as the General Assembly shall specify, and not otherwise. Section 11 provides for an annual tax levy to pay the interest on and meet the retirement of such bonds. By section 12 the manner of submission of the act to the vote of the people is prescribed, together with the form of ballot. Section 13 provides for the publication of the act before the election. Section 14 requires that the act shall be irrepealable until the debt and interest are paid, and section 15 provides that the act shall go into force only after receiving the majority of the votes required by the constitution.

Appellant's objections relate to the manner of passage of the act and the power of the legislature to enact it.

Concerning the objection that the law was not passed as required by the constitution, it is contended that under section 18 of article 4 of the constitution the act was not voted for by two-thirds of all of the members elected to each of the houses and that the vote thereon was not entered on the journals of each house, as required by law.

The proof in the record shows that the act received 150 affirmative votes in the house and 48 affirmative votes in the senate. No vote was cast against the act in either branch of the legislature. The evidence also shows that the same was passed on yea and nay vote and was properly entered upon the journals of both houses, and even though section 18 of article 4 of the constitution, requiring a two-thirds vote of all members of each house, is applicable to this bill, (which is not conceded,) those conditions are shown to have been fully complied with. The evidence shows that the act was published as required by law.

It is contended that the majority of the electors of the State voting at said election did not vote for the act, as required by section 18 of article 4 of the constitution. That section requires an affirmative vote by a majority of the voters voting at an election for members of the General Assembly. This court held in *Mitchell* v. *Lowden,* 288 Ill. 327, that under the system of minority representation in this State a majority of the voters voting at the election must vote for the act, and that it is not required that it receive a majority of the total vote for members of the legislature, which might be three times the number of voters. In this case the proof shows that 1,220,815 votes were cast in favor of the act and 502,372 votes against it. The highest legislative vote at the election was 1,704,857, showing a majority for the act of 368,387 votes. The act received a constitutional majority.

Appellant also contends that the act violates the provision of section 13 of article 4 of the constitution requiring that no act shall embrace more than one subject, which shall be expressed in the title; that in the present act the provisions for the creation of a debt of $55,000,000, the appropriation of that sum, the provision for an annual tax, the requirement that funds shall be paid out in accordance with the State Finance act, the creation of a special fund in the State treasury known as the soldiers' compensation,

307—30

bond, interest and retirement fund, and the creation of a Service Recognition Board, are all provisions of the act not expressed in the title. The title to an act is not an index of it. The purpose of the constitutional provision here referred to is to prevent joining in one act unrelated subjects. The restriction does not apply to the provisions in the act provided said provisions are germane to the title of the act. (*Dolese* v. *Pierce*, 124 Ill. 140.) The rule has frequently been laid down by this court that if the title of an act be general, any number of provisions may be contained therein, no matter how diverse they may be, so long as they are not inconsistent with or foreign to the general subject and so long as they may be considered in furtherance of the subject. (*Mitchell* v. *Lowden, supra; People* v. *Ankrum*, 286 Ill. 319; *Sutter* v. *People's Gas Light Co.* 284 id. 634; *People* v. *Sargent*, 254 id. 514; *People* v. *McBride*, 234 id. 146.) The act in this case is not open to this objection.

Nor can it be objected that because section 9 of the act provides that the funds accruing shall be payable in accordance with the provisions of the State Finance act the act violates the provision of the section of the constitution relating to amendments. This court has held that there is no constitutional objection to incorporating in an act the provisions of another law by reference thereto. *People* v. *Stitt*, 280 Ill. 553; *Zeman* v. *Dolan*, 279 id. 295.

Appellant contends that the submission of this act to the vote of the people, containing, as it does, provisions authorizing a debt to be contracted and others providing for the levy of a tax, violated the provision of section 18 of article 2 of the constitution requiring that all elections shall be free and equal, in that it restricted the right of suffrage by compelling the voters to cast their ballots either for or against both laws, thereby depriving them of any freedom of choice. This objection was considered by this court in the case of *Mitchell* v. *Lowden, supra,* where a law similar

in this respect was questioned, and it was there held not to be a violation of the constitution.

It is the contention of appellant that the act violates section 12 of article 4 of the constitution, requiring a yea and nay vote upon each bill separately, it being contended that this act was, in effect, two bills, for the reason just referred to. This question is likewise disposed of contrary to the contention of appellant in *Mitchell* v. *Lowden, supra.*

The bill also charges that the act violates section 16 of article 4 of the constitution, which prohibits the appropriation of money by private laws; and also section 17 of article 4 of that instrument, prohibiting the withdrawal of money in the treasury except in pursuance of appropriations made by law. Section 16 referred to does not prohibit an appropriation to a private person but prohibits appropriations for any purpose in a private law. (*Fergus* v. *Russel,* 277 Ill. 20.) As to the objection that the act violates section 17 of article 4 of the constitution, an examination of the provisions of section 9 of the act in question, requiring that payments be made in accordance with the act in relation to State finance, is sufficient to show that such objection is not well founded.

It is also contended that section 19 of article 4 of the constitution is violated. That section provides that the General Assembly shall never grant extra compensation to any public officer, agent, servant or contractor after service has been rendered or contract has been made. The recipients of the compensation in this case do not come within this specification of the constitution. They do not stand in the relation of public officer, agent, servant or contractor of or with the State, and that section has no application here.

The principal contention of appellant is that the act in question is in violation of section 20 of article 4 of the constitution. That section provides: "The State shall never pay, assume or become responsible for the debts or liabilities of, or in any manner give, loan or extend its credit to

or in aid of any public or other corporation, association or individual." The argument is, that the act gives or extends to the persons benefited thereby the credit of the State by the issuance of bonds and the payment of the proceeds thereof to such individuals. Appellees, on the other hand, contend that the act does not give or extend the credit of the State, but that it gives, if anything, the proceeds or the funds arising from the bonds. The proceeds can be used only for the purpose provided in the act and are to be secured by the use of the credit of the State. Whether the payment of such proceeds is to be considered a gift or the payment of a moral or other obligation on the part of the State, the credit of the State is used to provide that payment. Whatever the purpose of the act, the thing done is to use the credit of the State for that purpose. It may not be said that the State loans or extends its credit to the individual for the reason that a loan or extension of credit is in the nature of suretyship and presupposes a primary liability on the part of the individual to whom the credit is loaned or extended and a duty on his part to protect his surety. In the giving of the credit of the State no primary liability on the part of the recipient thereof is presupposed or contemplated, but the credit of the State is used without resultant obligation on one benefited thereby to re-pay the funds or protect the State. The State uses its credit as a means of procuring those funds, and if the only purpose of the act before us be a private one for the benefit of individuals, the act comes within the prohibition of this section of the constitution and cannot be sustained. If it can be seen, however, that the purpose of the act is one which the State may carry out, the fact that, as incident to its execution, individuals are benefited is not sufficient to make the act a private act for private benefit, merely.

The language of section 20 of article 4 indicates that the thing sought to be avoided by it is the loaning, giving or extending of the credit of the State to private enter-

prise or in the aid of any municipal corporation authorized by the State. That such construction is to be placed upon it is also evidenced by its history. Under the first constitution of the State, adopted in 1818, no limit was placed on the power of the General Assembly to borrow or expend money. Under that constitution large sums of money were borrowed by the State for purposes of internal improvements, among which were private enterprises, such as railroads, whose bonds were guaranteed by the State. The result was the accumulation of an exorbitant public debt. To meet the widespread demand for retrenchment there was inserted in the constitution of 1848, as section 37 of article 3 thereof, a provision limiting the power of the legislature to incur indebtedness to the sum of $50,000 except for repelling invasion, suppressing insurrection or defending the State in war, unless it be by a vote of the people. Section 38 of article 3 of that instrument prohibited the use of the credit of the State for the benefit of any individual, association or corporation. This restriction, however, was not made applicable to municipal corporations, and at the time of the constitutional convention of 1870 the indebtedness of counties, townships and cities of the State amounted to approximately $40,000,000. Section 37 of article 3 of the constitution of 1848 was drafted into the constitution of 1870, except that the amount was raised from $50,000 to $250,000, and became section 18 of article 4. Section 38 of article 3 of the constitution of 1848, with the added provision prohibiting the State from paying, assuming or becoming responsible for the debts or liabilities of, or giving, loaning or· extending its credit to, any public or other corporation, became section 20 of article 4 of the present constitution.

It is asserted by the appellant that this State is completely absolved from all duties and responsibilities in any war in which the United States and another country may be engaged, and that under sections 18, 19 and 20 of arti-

cle 4 of the State constitution it is prohibited from assuming any of the legal or moral obligations of the United States growing out of the war with Germany. There is no such limitation expressed in any one of said sections. Section 18 aforesaid, so far as applicable in this suit, is merely a limitation on the power of the legislature to incur debts against the State. The substance of the declaration in that section is, that it is the policy of the State that its obligations shall be paid out of revenues raised by taxation and that the State shall contract no debt for any purpose unless the law authorizing the same shall have been submitted to the people at a general election and shall have received a majority of the votes cast for members of the General Assembly at such election, etc. There are just two exceptions to this declared policy in section 18: (1) To meet casual deficits or failures in revenues, debts may be contracted not to exceed in the aggregate $250,000, and the sum so borrowed shall be applied to the purposes for which it was obtained and to no other; (2) the State is given unlimited power by its legislature to borrow money, without any authority given therefor by a vote of the people, for the purpose of repelling invasion, suppressing insurrection or defending the State in war. In section 19 it is again expressed in positive language that the General Assembly may make appropriations for expenditures incurred in suppressing insurrection or repelling invasion. Section 20 makes no reference to the State's duty or right to assist the United States in prosecuting its wars or in assuming obligations thereby incurred or in contributing to the expenses of such wars. It reads thus: "The State shall never pay, assume or become responsible for the debts or liabilities of, or in any manner give or extend its credit to or in aid of any public or other corporation, association or individual."

The debates and discussions concerning these three sections in the constitutional convention of 1870 show clearly

that the objects intended to be accomplished by section 18 were to prevent the possibility of the legislature incurring large and burdensome debts against the State by its engaging in the building of internal improvements, and particularly in building a canal from Chicago across the State to Rock Island, and also by assuming a large amount of municipal indebtedness that had been incurred by counties, cities, villages and towns by making donations or investing large sums of money in having built by private individuals and private corporations, railroads, canals, factories, etc., with the expectation that such private enterprises would build up and make prosperous said municipalities and the country in their immediate vicinity. Said section 20 was drafted as a part of the constitution for the purpose of more fully accomplishing the purposes of section 18. This is clearly indicated by the following words taken from the address of Hon. Joseph Medill, a member of that convention: "We were startled the other day by a statement from my colleague, Mr. Coolbaugh, that he had read in the Auditor's report that the present municipal indebtedness of this State, including counties, townships and cities, had swollen to the enormous amount of $40,000,000. I can see, like a creeping shadow on the wall, the time approaching when a log-rolling scheme will be brought into some near future legislature to saddle on the State of Illinois the assumption of that $40,000,000,—perhaps twice, aye! thricetold! I therefore regard this section [section 20] as of the intensest importance,—the ounce of prevention that some day will save more than a pound of cure."

It is also made clear by the debates and the discussions concerning sections 18, 19 and 20 that there were a number of the members of the convention who became apprehensive that sections 18 and 20 might interfere with the established policy of this State to hold itself obligated to render assistance to the United States when engaged in war by contributing to the expenses thereof and assuming obli-

gations of the government contracted in such wars. When
section 18 was up for consideration the following provision
was offered in lieu of the present one on this subject in
that section: "and no other debt, except to repel invasion
of the State or of the United States, to suppress insurrec-
tion in the State or in the United States, or to defend the
State or the United States in war," etc. The reason given
for offering this amendment was that in 1861 Illinois had
contracted a debt of $2,000,000, the proceeds of which were
to be used in assisting the United States in paying the ex-
penses of and prosecuting the war of the rebellion. The
amendment offered did not prevail, for the reason that
the members of the convention thought that section 18 as
drafted in no way prohibited what the members regarded
as the duty of the State to assist the United States in the
prosecution of its wars by contributions of money. It was
pointed out in the convention that sections 18 and 20, or
the substance thereof, were incorporated in the constitu-
tion of 1848 as sections 37 and 38 of article 3 thereof, and
that under those provisions no member of the legislature
or either of the constitutional conventions had ever consid-
ered that said sections were any limitation whatever upon
the right or power of the State to assist the government of
the United States in the prosecution of its wars by contri-
butions of money or by assuming any of its responsibilities
connected with such wars.

The unlimited power of the legislature to contract debts
does not, however, exist except in case of actual invasion,
insurrection or war, or threatened and imminent danger of
the same. This State may be said to be in war, within the
meaning of section 18, when the United States is at war
with a foreign power or rebellion exists within its borders
and it has made legal requisition on the States for men or
means to conduct war. The United States, when in war,
is not to be included within the designation "any public or
other corporation or individual," found in section 20. Sec-

tion 18 defines the entire powers of the legislature to incur indebtedness except by a vote of the people, and a vote of the people cannot make valid any debt, liability, compensation, fee or allowance that is inhibited by sections 19 and 20.

The State was not engaged in war, repelling invasion or suppressing an insurrection when the General Assembly passed and submitted to the people the act in question, nor was it threatened with such calamity. This act is not to be sustained on such ground. The principal question involved in the case is whether or not the debt sought to be incurred against the State is for a public purpose not inhibited by the provisions of section 20.

The legislature possesses all powers not prohibited by the limitations of the constitution. The State is intrusted with sovereign powers for the welfare of the people and must also be intrusted with the means of executing those powers. Powers vested in the legislature imply the ordinary means of execution. The power to tax, for example, carries with it the power to enforce the collection of taxes. The power to regulate the conduct of the individual carries with it the power to punish infractions of such regulations. With the power of the State to carry out any valid purpose, passes, as incident thereto, the power to provide the means of carrying out that purpose. (*McCulloch* v. *Maryland,* 4 Wheat. 316.) If the purpose of the act in question is one which lies within the sovereign power of the State, the credit of the State may be used in furtherance thereof when the method prescribed by the constitution is followed, and such purpose is not defeated by the fact that individuals benefit thereby. The execution of a public purpose which involves the expenditure of money is usually attended with private benefits. In *Boehm* v. *Hertz,* 182 Ill. 154, this court upheld an appropriation to the Illinois State Normal University on the ground that while the university was a private corporation it was used as an agency of the State to increase the efficiency of the public schools by the training

of teachers therefor. That decision was, in effect, that while a private corporation benefited by the gift the purpose of the appropriation was public, and the act providing for it did not come within the prohibition of section 20 of article 4 of the constitution.

It has always been the rule that the power of the State legislature to levy and collect taxes rests upon the public character of the purpose for which such tax is to be levied. It is the duty of the legislature to see that the taxing power is not used for private interest instead of public purpose. There can be no lawful tax which is not laid for a public purpose. (Cooley's Const. Lim. 479.) This limitation on the sovereign taxing power is of the essence of all free government.

Whether a tax or an appropriation is for a public or private purpose is a question not always easy of determination. In deciding whether such purpose is public or private, courts must be largely influenced by the course and usage of the government, the object for which taxes and appropriations have been customarily and by long course of legislation levied and made, and what objects have been considered necessary to the support and for the proper use of the government. Whatever lawfully pertains to this purpose and is sanctioned by time and the acquiescence of the people may well be said to be a public purpose and proper for the maintenance of good government. (*Loan Ass'n* v. *Topeka,* 20 Wall. 655.) What is for the public good and what are public purposes are questions which the legislature must in the first instance decide. In so doing it is vested with a large discretion, which the courts cannot control except where its action is evasive of or contrary to some prohibition of the constitution. Limitations resting in theory, only, or on the vague ground of doubt, but which the people have been satisfied to leave to the judgment, patriotism and sense of justice of their representatives, are not within the control of the courts. (*Loan Ass'n* v. *Topeka, supra;* Cooley's

Const. Lim. 154.) The power of the State to expend public moneys for public purposes is not to be limited, alone, to the narrow lines of necessity, but the principles of wise statesmanship demand that those things which subserve the general wellbeing of society and the happiness and prosperity of the people shall meet the consideration of the legislative body of the State, though they ofttimes call for the expenditure of public money. If it can be seen that the purpose sought to be obtained is a public one and contains the elements of public benefit, the question how much benefit is thereby derived by the public is one for the legislature and not the courts. (*Taylor* v. *Thompson,* 42 Ill. 9; *Loan Ass'n* v. *Topeka, supra; Daggett* v. *Colgan,* 92 Cal. 53; 14 L. R. A. 474,* note.) In determining whether or not the sovereign taxing power is used in the public interest, the judgment of the legislature is to be accepted in the absence of a clear showing that the purported public purpose is but an evasion and that the purpose is, in fact, private. *Jones* v. *City of Portland,* 245 U. S. 217; *State* v. *Johnson,* 170 Wis. 218; *Gustafson* v. *Rhinow,* 144 Minn. 415; *State* v. *Clausen,* 113 Wash. 570; *Opinions of Justices,* 211 Mass. 608.

Is the purpose of this act public, or private, only? If it be the latter it is within the prohibition of section 20 of article 4 of the constitution; if the former, it is not. The granting of bonuses or payments in recognition of military service has been authorized by many States of the Union. Acts of such character have been sustained on the ground that they are for a public purpose, in that they incite patriotism, encourage the defense of the country in future conflicts and promote public welfare. It is sound doctrine that the State ought to do for the public good that which it is empowered to do. That governments are instituted for the purpose of making secure the rights of life, liberty and the pursuit of happiness is a foundation principle of the republic written in the Declaration of Independence and recog-

nized by all courts. Free government is based upon the security of these rights in its citizenship. Representative government finds its greatest security in a strong spirit of patriotism and love of country. That the State as well as the national government is interested in the furtherance of such a spirit is a fact which lies at the very foundation of our form of government. The constitution of this State is ordained and established, as shown by its preamble, "in order to form a more perfect government, establish justice, insure domestic tranquility, provide for the common defense, promote the general welfare, and secure the blessings of liberty to ourselves and our posterity." The citizenship of the several States is the citizenship of the Union. All sovereign powers of the State and the Union emanate from the people and rest in them. (*McCulloch* v. *Maryland, supra.*) Therefore that which tends to a greater patriotism and a greater interest in government makes for the welfare of the State as well as the Union. That the purpose to promote such a spirit is a public purpose is therefore not in the realm of debate. Nor is it within the uncertain shadow of doubt that the payments of compensation provided in this act will tend to encourage such a spirit of loyalty and patriotism. Such recognition demonstrates to those who have given service to their country that in future conflicts, if any there be, the State will not fail to appreciate such service. The erection of monuments and the awarding of swords or medals have always been recognized as means of rewarding meritorious service, and it is not questioned that the legislature may use the public funds for such purposes. While the payment of money may have in it an element of private benefit which is not found in the erection of a statue or the gift of a medal, yet it is no less a recognition of meritorious services, and does not, because it is money, become a private purpose, merely. That the purpose of this act is public and not private seems beyond debate. Numerous courts of this country have held that acts

similar to the one before us tend to incite patriotism, encourage the defense of the country in future conflicts and promote the public welfare of the State, and therefore serve a public purpose. *United States* v. *Hall,* 98 U. S. 343; *State* v. *Johnson, supra; State* v. *Clausen, supra; Gustafson* v. *Rhinow, supra; Opinions of Justices, supra; Daggett* v. *Colgan, supra; Veterans' Welfare Board* v. *Riley,* 206 Pac. 631; *Veterans' Welfare Board* v. *Jordan,* 208 id. 284; *People* v. *Westchester County Nat. Bank,* 231 N. Y. 465.

It is contended, however, that the question whether or not the purpose is a public one is not the sole test as to whether this act provides for a proper use of the credit of the State; that public money cannot be paid to individuals through the use of the credit of the State where there is no moral or legal obligation of the State to that individual. It is not contended that the obligation must be a legal one, cognizable in a court of law, but that an equitable or moral claim on the part of the individual against the State is an element necessary to the validity of this act. It may be observed that it is incongruous to say that such a public purpose may not be carried out to the benefit and welfare of the State unless it rests upon some legal or moral obligation to an individual. . If the purpose be public it is so because it makes for the public weal. If such be the effect of it, the power to carry out such purpose does not rest on obligation to the individual but is found in the general welfare provisions of the constitution, and is based upon the principle that the State is empowered to do that which it ought to do for the public good. Such purpose is not primarily concerned with the interest of the individual but with the welfare of the public as a whole.

But conceding, for the purpose of following the argument to its conclusion, that at least a moral obligation must exist, it cannot well be doubted that if it does exist the State may provide for it. In *United States* v. *Realty Co.* 163

U. S. 427, the court said: "The power to provide for claims upon the State founded in equity and justice has also been recognized as existing in the State governments. For example, in *Gilford* v. *Chenango County Supervisors,* 13 N. Y. 143, it was held by the New York Court of Appeals that the legislature was not confined in its appropriation of public moneys to sums to be raised by taxation in favor of individuals in cases in which the legal demands existed against the State, but that it could recognize claims founded in equity and justice in the largest sense of these terms, or in gratitude, or in charity. Of course, the difference between the power of the State legislatures and that of the Congress of the United States is not lost sight of, but in relation to the power to recognize and to pay obligations resting upon moral consideration or upon the general principles of right and justice the Federal Congress stands on the same level with the State legislature."

We proceed, then, to a consideration of the question whether the facts upon which this act is based give rise to an obligation on the part of the State to those who will be benefited by the act. It may be conceded that no legal obligation exists. Is there a moral obligation resting on the State? Appellant urges that there is not; that while the war involved the safety of the several States, yet the States called no men into the service and waged no war; they did nothing; they exercised no authority; those giving service were in no respect the servants of the States. It is said that while the services rendered to the United States incidentally benefited every State, there is no foundation for a claim or obligation though there may be a strong feeling of gratitude. Counsel cite in support of this contention *People* v. *Westchester County Nat. Bank, supra,* wherein the New York Court of Appeals, under constitutional provisions similar to ours, held that a moral obligation running to the individual is necessary to the validity of such an act and that such moral obligation does not exist. They

also cite *Veterans' Welfare Board* v. *Riley, supra,* and *Veterans' Welfare Board* v. *Jordan, supra,* decided under constitutional provisions similar to ours, though in the latter cases other features not present in the case at bar were of importance.

It is of the essence of a moral obligation that it arise out of a state of facts appealing to a universal sense of justice and fairness though upon such facts no legal claim can be based. The State may be said to owe a moral debt to an individual when his claim grows out of the principles of right and justice. When it is of such a nature as to be binding on the conscience or honor of an individual it may be said to be based upon considerations of a moral or honorary nature of which the State may take cognizance. Payments to individuals in the nature of a gratuity yet having some features of a moral obligation to support them have been made by Congress since the foundation of the government. (*United States* v. *Realty Co. supra.*) In determining whether such a state of facts exists here, it is to be considered, though by no means of first importance, whether a fair compensation or recognition has already been afforded for the service rendered. No one will have the hardihood to contend that the material sacrifice of those in service has been met in a manner that in any way approaches compensation. Whether they enlisted or were drawn, the call to service was one made applicable to men, only, leaving to men and means not called the enjoyment of huge profits that came by reason of the war. It seems beyond cavil that no fair compensation has been afforded for these services.

In determining whether there exists a state of facts from which a moral obligation arises, it is to the greatest degree important that the relation existing between the service of the individual in the war and the public welfare of the State be considered. It is urged that Congress, alone, has the power to raise armies and to prosecute war; and this is true. This power, like all powers of the national govern-

ment, has been conferred by the people of the various States. With the powers conferred certain duties have been imposed. Among these is the duty to preserve to the States a republican form of government. That which tends to overthrow or defeat the national government tends to the defeat and downfall of the republican form of government guaranteed to the State by the constitution. (*People* v. *Lloyd,* 304 Ill. 23.) The States, as such, as well as the people of the various States, are directly affected thereby. He who serves in war with a foreign foe fights for his State to preserve to it the republican form of government guaranteed. Distinction between the national and State governments in times of war is more artificial than real. The army, when raised and put into action, though the army of the Union, is supplied by the States. By the provisions of the Selective Service act, passed by Congress and approved May 18, 1917, the States, as such, were required to take an active part in the war. Section 4 of that act contains this language: *"Provided,* that notwithstanding the exemptions enumerated herein, each State, Territory and the District of Columbia shall be required to provide its quota in the proportion that its population bears to the total population of the United States." Section 6 of that act provides: "The President is hereby authorized to utilize the service of any or all departments and any or all officers or agents of the United States and of the several States, Territories and the District of Columbia, and subdivisions thereof, in the execution of this act, and all officers and agents of the United States and of the several States, Territories and subdivisions thereof, and of the District of Columbia, and all persons designated or appointed under regulations prescribed by the President, whether such appointments are made by the President himself or by the Governor or other officer of any State or Territory, to perform any duty in the execution of this act, are hereby re-

quired to perform such duty as the President shall order or direct." This act was an evident exercise of the implied power of the national government to control and direct the States, as an incident to the express power to raise armies and wage war. Under the selective service regulations prescribed by the President by authority of this act, all calls for troops were made upon the Governors of the States, and the various departments and officers of the States were controlled and directed by the national government. It becomes evident, therefore, that the States, though not parties to the declaration of war, were actual parties to its prosecution. They were required to supply certain quotas of men. This was a direct call upon the States. When a citizen of Illinois responded to that call he became not only a soldier or sailor of the national government but likewise of Illinois, responding for his State to fill the quota of men required of it.

We cannot escape the conviction that the close relation existing between the services of the individual and the general welfare of the State gives rise to a claim appealing to a universal sense of fairness and justice. While we have great respect for the courts holding that no moral obligation exists under the state of facts surrounding the act before us, we are constrained to adopt the contrary view. We are of the opinion that the act is not subject to the constitutional objections urged and that the chancellor was right in dismissing the bill for want of equity.

The decree will therefore be affirmed.

*Decree affirmed.*

CARTWRIGHT and DUNN, JJ.: We have taken no part in the consideration or decision of this case.