JOHNS HOPKINS UNIVERSITY ET AL. *v.* WILLIAMS

[No. 139, October Term, 1951.]

*Decided March 5, 1952.*

384

The cause was argued before MARBURY, C. J., and DELAPLAINE, COLLINS, HENDERSON and MARKELL, JJ.

*Harry N. Baetjer* and *Arthur W. Machen, Jr.,* with whom were *Venable, Baetjer & Howard* on the brief, for Johns Hopkins University, appellant.

*Hall Hammond, Attorney General,* with whom was *Robert M. Thomas, Assistant Attorney General,* on the brief, for Board of Public Works of the State of Maryland, appellant.

*Harrison L. Winter,* with whom were *Seymour O'Brien* and *Miles, Walsh, O'Brien & Morris* on the brief, for the appellee.

MARBURY, C. J., delivered the opinion of the Court.

This is a taxpayer's suit to enjoin the Board of Public Works of Maryland from issuing a State loan of $1,500,-000 under the provisions of Chapter 414 of the Acts of 1951. This act provides that the cash proceeds of the loan, after paying the usual costs and expenses, shall be paid to the Board of Trustees of the Johns Hopkins University for the construction and equipping of a new building at Homewood for the School of Engineering of said university, to be used for the general purposes of said School of Engineering, including an industrial research laboratory. It is contended that this act is in violation of Sec. 34 of Article III of the Constitution of the State, and hence is unconstitutional, null and void,

and of no effect. An answer was filed by the Board of Public Works. The Johns Hopkins University asked leave to intervene, and also filed an answer. A stipulation of facts was filed, some testimony was taken, and the chancellor filed a decree in the Circuit Court of Baltimore City, holding that Chapter 414 was void, and enjoining the issuance of the bonds. From this decree an appeal was taken to this court by the Johns Hopkins University. The Board of Public Works, although nominally a defendant, took a somewhat neutral position below, and continued to take that position here. The Attorney General, who represented the Board, is inclined to agree with the decision of the chancellor.

The case turns upon the proper interpretation of Sec. 34 of Article III of the Constitution. That section reads in part as follows, with the special clause claimed to be applicable italicized:

"No debt shall be hereafter contracted by the General Assembly unless such debt shall be authorized by a law providing for the collection of an annual tax or taxes sufficient to pay the interest on such debt as it falls due, and also to discharge the principal thereof within fifteen years from the time of contracting the same; and the taxes laid for this purpose shall not be repealed or applied to any other object until the said debt and interest thereon shall be fully discharged. *The credit of the State shall not in any manner be given, or loaned to, or in aid of any individual association or corporation*; nor shall the General Assembly have the power in any mode to involve the State in the construction of works of internal improvement, nor in granting any aid thereto which shall involve the faith or credit of the State; nor make any appropriation therefor * * * ."

This section did not originate with the Constitution of 1867. It was substantially the same as Sec. 33 of Article III of the Constitution of 1864, and was first

adopted as Sec. 22 of Article III of the Constitution of 1851. The italicized portion was exactly the same, except that some commas were left out in 1867. It is not suggested, however, that this changes in any way the meaning or intention of the section. In the Constitutions of 1851 and 1864, the last clause read: "* * * nor shall the general assembly have the power in any mode to involve the State in the construction of works of internal improvement, *nor* ["or" in 1851] *in any enterprise* which shall involve the faith or credit of the State, nor ["or" in 1851] make any appropriations therefor; * * *". The words "nor in any enterprise" were changed in 1867 to "nor in granting any aid thereto". In the Constitution of 1851, the debts contracted under the first sentence and remaining unpaid were limited to one hundred thousand dollars. This limit was eliminated in the succeeding constitutions.

It has been said by this court that the rule which above all others gives life to the written law and makes its use possible for the government and control of men in carrying on the actual business of life is that, "while the principles of the Constitution are unchangeable, in interpreting the language by which they are expressed it will be given a meaning which will permit the application of those principles to changes in the economic, social, and political life of the people, which the framers did not and could not foresee. * * * In determining the true meaning of the language used, the courts may consider the mischief at which the provision was aimed, the remedy, the temper and spirit of the people at the time it was framed, the common usage well known to the people, and the history of the growth or evolution of the particular provision under consideration. * * * In aid of an inquiry into the true meaning of the language used, weight may also be given to long continued contemporaneous construction by officials charged with the administration of the government, and especially by the Legislature." *Norris v. Mayor and City Council of Baltimore,* 172 Md. 667, 675, 676, 192 A. 531, 535. "Great

weight has always been attached, and very rightly attached, to contemporaneous exposition." Chief Justice Marshall in *Cohens v. Virginia,* 6 Wheaton 264, 418, 5 L. Ed. 257. "A contemporaneous construction placed upon a particular provision of the organic law by the legislative department of the government, acquiesced in and acted upon without ever having been questioned, followed continuously and uniformly from a very early period * * * furnishes a very strong presumption that the intention is rightly interpreted." *Trustees of the Catholic Cathedral Church of Baltimore v. Manning,* 72 Md. 116, 130, 19 A. 599, 603. *Wyatt v. State Roads Commission,* 175 Md. 258, 264, 1 A. 2d 619. "While the construction of statutes or constitutional provisions is a judicial function, courts may, in declaring their meaning and effect, avail themselves of the construction put upon them by the Legislature by long continued custom and acquiescence." *Humphreys v. Walls,* 169 Md. 292, 299, 181 A. 735, 738. "In interpreting the Constitution the first thing to be got at is, what was the purpose of its framers? Where this has not been clearly expressed, we must look to the necessity and nature of the thing provided for, or against, as the case may be. With this guide we can experience but slight, if any difficulty, in ascertaining the meaning of the language used in the section quoted." *Buckingham v. Davis,* 9 Md. 324, 328.

These quotations indicate the proper method by which the courts are to determine the meaning of ambiguous constitutional provisions, or those which are susceptible of more than one meaning. Of course, if they are clear and unambiguous, then there is no construction or clarification necessary or proper. It is also true that while contemporaneous construction or acquiescence in a particular course of dealing is of very great assistance, such construction or acquiescence cannot make an unconstitutional law constitutional. *Somerset Co. v. Pocomoke Bridge Co.,* 109 Md. 1, 71 A. 462. *Theatrical Corp. v. Brennan,* 180 Md. 377, 387, 388, 24 A. 2d 911.

The Johns Hopkins University is a private, non-stock corporation engaged in the promotion of education in the State of Maryland at the collegiate and post-graduate levels. It is in no sense engaged in the construction works of internal improvement, and, therefore, any prohibition which may be construed to prevent the issuance of the state loan under Chapter 414 of the Acts of 1951 must be found, if at all, in the credit clause of the second sentence of Sec. 34, which we have italicized, and which begins: "The credit of the State . . ." etc. The question is whether, by the sale of bonds and the gift of the proceeds to the university, the credit of the State has been in any manner given or loaned to, or in aid of, the university.

The credit clause was not original with the framers of the Constitution of 1851. It is exactly the same as a clause inserted in the Constitution of the State of New York, adopted in the year 1846, and the basic reasons for its adoption in New York were the same as those which caused its insertion in the Maryland Constitution. During the second quarter of the 19th Century, these two states, as well as others, had given millions of dollars of state funds in the promotion of privately owned railroads and canals. It was a period of great expansion of internal improvements such as these, and what was done turned out to be a reckless and improvident use of public funds. The situation in New York is aptly described by Mr. Alvord, a member of the Constitutional Convention of New York of 1867, reported in Vol. 3 of the Proceedings and Debates of the Convention, at page 1844. He said: "The past history of this State previous to the Constitution of 1846 was this: if a railroad or some enterprise of that kind was started in any portion of the State, and was unable as it seemed to get along without some State aid the State came in as an indorser or security for the road, loaning to the road or to the corporation its bonds, payable at a future period of time, with an agreement on the part of the corporation to take care of the interest as it became due and ulti-

mately to redeem the principal. The result was in very many instances the State lost the entire amount of the investment." A complete discussion can be found in Lincoln's Constitutional History of New York, Vol. 2, pages 73 to 101. An illustration of the method used may be found in Chapter 170 of the Laws of New York of 1836, which authorized the issuance of $3,000,000 worth of state certificates of stock to the New York & Erie Railroad Company. This stock was called "The New York & Erie Railroad State Stock", and the faith and credit of the State was pledged for the payment of interest and redemption of the principal. The company was authorized to sell the stock at public auction, the tolls and income from the use of the road were pledged to the payment of the interest, and the company was directed to make provision for the punctual redemption of the principal. In Governor Bouck's message of 1843, he said that, at that time, the credit of the state, amounting, in the aggregate, to $5,235,700, had been loaned to the "Delaware & Hudson Canal Company, New York & Erie, Ithaca & Owego, Catskill & Canajoharie, Auburn & Syracuse, Auburn & Rochester, Hudson & Berkshire, Tonawanda, Long Island, Schnectady & Troy Railroad Companies, and the Tioga Coal, Iron Mining, and Manufacturing Company." Governor Wright said, in 1845, that more than three-fifths of the debt chargeable on the general fund had been contracted "by loans of the credit of the state to railroad corporations, which have wholly failed, and thrown the amount upon the general fund." Lincoln's Constitutional History of New York, Vol. 2, p. 100. There was, therefore, no doubt in the minds of the members of the Convention of the State of New York of 1846 that, by these means, the credit of the state had been loaned to these private railroads and canal companies, and it was rapidly being impaired. The New York Convention of 1846 discussed the general situation at some length, but the form of the preventive provision was adopted unanimously after only four members had discussed it. The entire record on this is found

in Lincoln's Constitutional History, Vol. 2, p. 180, and the section adopted as Sec. 9 of Article VII of the New York Constitution of 1846 was precisely the same as the credit part of the second sentence in our Sec. 22 of Article III of our Constitution of 1851.

We have discussed the origin of this section, and the facts leading to its adoption by the State of New York, because conditions were practically the same here. The procedure, both in New York and in Maryland, was for the State to issue its securities to the railroad or canal company, and the latter would agree to pay the principal and interest. This is mentioned by Mr. Thomas as the method used by this State to contract a debt of more than $7,000,000 to pay for stock taken in the Chesapeake & Ohio Canal Company prior to 1839. (Debates of the Convention of 1850, p. 357.) The situation had become so bad in 1842 that the Legislature, by Chapter 276 of the session of that year, attempted to provide that from and after the confirmation of the statute by the next General Assembly, it should not be lawful for the Legislature to aid in the making of any railroads, canals, or other works of internal improvement by the passage of any law or resolution authorizing any loan, or the issuance of any bonds or other evidences of debt for the *resumption* [redemption] of which the State might be or become in any manner responsible. In the same session of the Legislature was enacted Chapter 301 which recited the embarrassment of the finances of the State, and directed the sale of the interest which the State held in the Chesapeake & Ohio Canal Co., the B. & O. Railroad Co., the Washington Branch Railroad Co., the Tidewater Canal Co., and the Susquehanna Railroad Co. The State was on the verge of bankruptcy, Chapter 301 of the Acts of 1842 could not be carried out, and, finally, in 1846, the Legislature passed laws imposing additional taxes to meet the overdue and accruing obligations of the State. (See argument of counsel in *Bonsal v. Yellott*, 100 Md. 481, 60 A. 593, 69 L. R. A. 914.)

This was the picture, then, which confronted the Convention of 1850, and it was to prevent the recurrence of such conditions that Sec. 22 of Article III of the Constitution of 1851 was adopted. The Debates of the Conventions of 1864 and 1867 throw no light on the subject, and we must therefore turn to the Debates of 1850 to see how the section developed its present form. The original draft of the article submitted by the Committee on the Legislative Department provided against loans upon the credit of the State which would not be redeemable at the pleasure of the State, unless approved by two successive sessions of the General Assembly. (Debates, 124). This was first amended, as proposed by Mr. George, to require the assent of two-thirds of the members elected to each branch of the Legislature to "every bill appropriating the public money, or pledging the public faith, for local or private purposes" and prohibiting the making of "appropriations, loans or subscriptions, to any work of internal improvement". (Debates, 340). Another version was later submitted by Mr. George, *prohibiting the appropriation of public money or the pledging of the public faith* "for the use of individuals, associations or corporations", as well as prohibiting appropriations, loans, or subscriptions to works of internal improvement. (Debates, 414). An amendment to this proposal was offered, adding after the words "individuals, associations or corporations", the exception "except for purposes of education". (Debates, 430). This was first adopted, then reconsidered (Debates, 433), and finally rejected (Debates, 435). During the discussion, Mr. Grason said the language used was "never intended to prevent appropriations for the purposes of education, but was merely an inhibition of appropriations for the building of corporations." (Debates, 434). Finally, Mr. McHenry suggested the amendment to Mr. George's second version which resulted in the adoption of the final form of the section. (Debates, 436). This amendment eliminated the prohibition against the *appropriation of the public money,*

or the pledging of the public faith *to the use* of individuals, associations or corporations, and broadened the prohibition against "appropriations, loans or subscriptions" to works of improvement, so that power was taken from the General Assembly "in any mode, to involve the State" in works of internal improvement, "or in any enterprise which shall involve the faith and credit of the State". An amendment was proposed to this draft reading: "Nor shall the legislature hereafter *create any debt*, or pledge the credit of the State, except for the purpose of education * * *". (Debates, 442, 443). This amendment was rejected, the amendment of Mr. McHenry was adopted, and the language proposed by Mr. George as thus amended, was adopted and became Sec. 22 of Article III of the Constitution of 1851, presented to and approved by the voters.

It is contended that the two rejected amendments with respect to education indicate an intention on the part of the Convention to include educational institutions in the prohibitions finally adopted, but we think this reasoning is inconclusive. The first amendment was to a draft which prohibited both appropriations and the pledging of the public faith. There was no public system of education in the State in 1850. Instruction was given in private academies, and in a few small colleges such as St. John's and Washington. There were members of the Convention who expressed themselves as being opposed to public funds being used in any way for educational purposes. Others thought education should be financed only by current taxation. We cannot say what was the reason, if there was any one reason, why the Convention as a whole refused to make the exception. In any event, the draft to which this amendment was offered was subsequently rejected. The second amendment was offered to the draft finally accepted, but the breadth of the prohibition that the Legislature should not create *any* debt, rather than the exception as to education, may well have been the reason for its rejection. Some of the delegates thought that the pro-

posed draft allowed state aid for education, and some thought the educational question should be considered when the report of the Committee on Education came before the Convention. We cannot, at this late date, ascertain with any certainty what the collective vote against the amendment meant. It may be noted that no public system of education was provided for in the 1851 Constitution, and that this was not done until 1864. (Constitution 1864, Art. VIII). A century ago, the views of many people on the necessity of any education at all were far different from those usually accepted today. We cannot now interpret Sec. 34 in the light of individual expressions of the members of the Convention of 1850, when the reasons given for their actions on the educational amendments are so varied, and when we do not know the real basis of the votes on these amendments.

The Constitution of 1867, by Section 54 of Article III, applied provisions similar to the credit provisions of Sec. 34 to the counties of the State. The purport of this section was not to permit any county to get into the business of the construction of railroads, canals, or other works of internal improvement, unless authorized by an act of assembly which had to be published for two months before the election of the members. It commences with the statement: "No County of this State shall contract any debt, or obligation . . .", etc., and continues, "nor give, or loan its credit to or in aid of any association, or corporation. . . .". This section was passed upon in the case of *Baltimore & Drum Point Railroad Co. v. Pumphrey*, 74 Md. 86, 110, 111, 21 A. 559, 562. In that case, an act had been passed, but not in the manner provided by Sec. 54, authorizing the county commissioners of Anne Arundel County to subscribe for $200,000 of the capital stock of the railroad. In order to meet such subscription, the commissioners were authorized to issue the bonds of the county, and to deliver them to the railroad company. This was the same method which had been used by the State in

the days before the Constitution of 1851, and, as Judge Alvey, in his opinion holding that the act was invalid, said: "The argument in support of this proposition is founded upon the particular terms of the section of the Constitution; that no county shall contract any debt or obligation, in the construction of any railroad, canal, or other works of internal improvements, nor give, or loan, its credit to or in aid of any association or corporation, unless authorized by an Act of the General Assembly, etc. The language of this section of the Constitution is very broad and comprehensive; and with a common knowledge possessed by the whole people of the State, we cannot fail to understand what was intended to be accomplished by this constitutional restriction. * * * The Act of 1872, authorizing the subscription to the capital stock of the railroad company, also authorized, for the purpose of meeting such subscription, the County Commissioners to issue coupon bonds, which of course would be negotiable; and, in another section, such bonds are required to be received by the railroad company, in payment of the subscription of stock. The primary object of this subscription, and the issue of bonds therefor, was to enable the railroad company to avail itself of the credit of the county to raise funds with which to prosecute its works; and it was therefore a loan of the credit of the county, in a constitutional sense, that the bonds were to be issued upon the subscription."

It is apparent from this decision that the turning over of county bonds to a railroad in exchange for its stock has been construed as a loan of the credit of the county. It is argued that there is no difference between this and selling the State's bonds and giving the proceeds to a corporation, and that on that basis we should strike down Chapter 414 which is before us in this case. There are two decisions of this court construing Sec. 34, but, although they contain many matters of historical interest, neither passed upon the credit clause of the second sentence. These cases are *Bonsal v. Yellott, supra,* and *Welch v. Coglan,* 126 Md. 1, 8, 94 A. 384. The first

holds that appropriations from the State treasury to aid the counties in the construction of public roads are not aids in the work of internal improvement. The second applies the same rule to a drainage or a sewage system. Other jurisdictions, however, have passed upon credit provisions similar to Sec. 34, and there is a diversity of opinion among them. The Court of Appeals of New York in *People v. Westchester Co. National Bank*, 231 N. Y. 465, 476, 493, 132 N. E. 241, 245, 251, 15 A. L. R. 1355 (1921), had before it the constitutionality of the New York Veterans' Bonus Act. This act provided for the issuance and sale of bonds of the State and the granting of the proceeds to veterans of the first World War. The majority of the court said that this was an evasion of the constitutional provision against the gift of the State's credit, thus deciding in the following words: "If not a loan then does this act contemplate a gift of the state's credit? In answering this question the mere form of the transaction is immaterial. If the gift of the bonds of the state to a railroad corporation would be such a gift—and it undoubtedly would be— then so would be an issue of bonds by the state with the express condition that their proceeds should be given to the same corporation. The evasion of the constitutional prohibition would be palpable ¡and it could not and should not be permitted." There were, however, two dissents in that case, one by Judge Cardozo, who held that it was not a gift to the veterans, but a payment of a debt owing to them, and the other by Judge Pound, whose views were expressed very definitely as follows: "The credit of the state is not given to or in aid of the recipients of the state's bounty under chapter 872, Laws of 1920. It is not given or loaned 'in any manner.' It is sold in the market to the purchasers of the bonds." It may be appropriate to note here that when the Maryland bonus act came before this court, the question was raised whether Sec. 34 prohibited it. The court decided that because the act was contingent upon the approval of the voters, it contained an unlawful

delegation of legislative power and was therefore void. (This was before the adoption of the constitutional amendment proposed by the Act of 1924, Chapter 327.) The court declined to deal with the question involving Sec. 34 of Article III, and said that it was of such importance that it should not be dealt with at all, unless its determination was necessarily involved in the disposition of the case.

There are other decisions which have interpreted provisions as to credit, such as are contained in Sec. 34, to prohibit the issuing of bonds and the payment of the proceeds to individuals. Thus, in California, in two cases, *Veterans' Welfare Board v. Riley,* 188 Cal. 607, 206 P. 631 (1922), and *Veterans' Welfare Board v. Jordan,* 189 Cal. 124, 208 P. 284, 22 A. L. R. 1515 (1922), both concerned with aid to veterans, the court there followed the New York case. The Supreme Court of the United States made a similar construction in *Jarrolt v. City of Moberly,* 103 U. S. 580, 585, 586, 26 L. Ed. 492, (1880), which involved the issuance of bonds by a municipal corporation in Missouri, in order to use the proceeds to purchase a machine shop to be given to a railroad. The court said: "* * * The issue of obligations directly to the company, association or corporation, without such previous assent, is within the letter of the prohibition, and to purchase property to be given to such company, association or corporation, by the issue of obligations to others, without such assent, is within its spirit. Both modes of using the bonds of the municipality are equally a use of its credit, the difference being that the one is a direct and the other an indirect way of employing the credit of the municipality for the benefit of the railway company. It would be a narrow and strict construction of the constitutional provision to hold that it prohibited the creation of indebtedness, by a municipality, by a direct use of its credit for the railway company, and yet permitted such creation by the indirect use of it for the same purpose." Another similar case is *Deering & Co. v. Peterson,* 75 Minn. 118, 77 N. W.

568 (1898), where the court said that since the state could not lend its credit, it could not borrow money on its bonds and then lend the money.

On the other hand, there are at least four cases which take a contrary view. These are *Grout v. Kendall*, 195 Iowa 467, 472, 473, 192 N. W. 529 (1923) ; *Hagler v. Small*, 307 Ill. 460, 468, 138 N. E. 849 (1923) ; *Bush v. Martineau*, 174 Ark. 214, 218, 295 S. W. 9 (1927) ; and *Gruen v. Tax Commission*, 35 Wash. 2d 1, 30, 211 P. 2d 651 (1949). In the Iowa case, which was a veterans' bonus case, the court construed a section of the state constitution which was the same as our credit clause, and which the court said had been copied directly from the New York constitution. The court said: "What is meant herein by a loan of *credit?* When one signs an accomodation note and delivers it to his neighbor, he loans his credit to his neighbor. He has not created a debt to him. The neighbor is authorized to use the credit with third parties; but he is also under obligation to the maker to protect him against liability and ultimately to return the note. When one becomes surety for his neighbor and signs his promissory notes to third parties, he loans his credit. * * * The liability of the surety is always secondary, and not primary. It is a liability for the debt of another, which such other is bound to pay. And herein is the delusion of suretyship. The surety assumes a secondary liability in the optimistic assurance and belief always that the primary debtor will pay, and that he will never be required to perform the obligation. * * * It was to remove this delusion of suretyship, with its snare of temptation, that this section of the Constitution was adopted. It withheld from the constituted authorities of the state *all power or function of suretyship*. It forbade the incurring of obligations by the indirect method of secondary liability. This is the field and the full scope of this section. It does not purport to deal with the creation of a primary indebtedness for any purpose whatever."

In the Illinois case, *Hagler v. Small, supra,* also a veterans' bonus case, the Supreme Court said: "It may not be said that the State loans or extends its credit to the individual * * *. The State uses its credit as a means of procuring those funds * * *". In the Arkansas case, *Bush v. Martineau, supra,* there was a constitutional prohibition against the loan of credit, and a state bond issue for the construction of roads was upheld because "It is not proposed in the act under consideration that the State shall *'loan* its credit', but only *use* its credit." There are two other cases which support the same contention on a different basis, namely, that a prohibition against giving credit to an individual county, corporation, or association, did not apply to objects of a charitable or quasi-public nature. These cases are *Hager v. Kentucky Children's Home Society,* 119 Ky. 235, 83 S. W. 605, 67 L. R. A. 815 (1904), and *Bedford County Hospital v. Browning,* 189 Tenn. 227, 225 S. W. 2d 41 (1949). In the latest case on the direct point, decided in November, 1949, by the Supreme Court of Washington (*Gruen v. State Tax Commission, supra*), the precise question was before the court in the construction of a veterans' bonus act. The Washington constitution contained the same provision as our Sec. 34. The court discussed the New York case which it said was directly in point, and then discussed the Iowa case and said: "To our minds, the holding of the supreme court of the state of Iowa is more convincing than is the holding in the New York case. In the Iowa case, the court simply determined the meaning of the constitutional provision according to the plain wording and intent of its sections."

The unquestionable historical reason for the proposal of the constitutional section, both in New York and in Maryland, was to curb the reckless and improvident investment of public funds in aid of railroads and canals, promoted by private corporations, organized primarily for profit to their stockholders, although they might eventually serve a public purpose. That was the evil that had impaired or threatened the credit of these and

other states, and that was the evil primarily in the minds of the framers of our constitution of a hundred years ago. Whatever they said in that instrument must be considered in the light of what they were trying to prevent in the future. Now, a century later, we must decide whether, by what they then said, they foreclosed something which was not and could not have been envisioned by them, and which had no relation whatever to the problems they were facing.

While we have no previous judicial interpretation on this question, we have a number of very definite and positive legislative and executive interpretations. The State has done exactly the same thing a number of times before, that is, it has issued its bonds and has given the proceeds to non-profit educational institutions. Acts have been passed by the General Assembly, signed by the Governor, bonds have been issued and sold, and we are informed, redeemed in due course. Thus, in 1904, nearly fifty years ago, a public building loan in the amount of $1,625,000 was authorized by Chapter 228 of the Acts of that year. Of that amount $57,000 was for the purpose of construction and completion of buildings for the Maryland Agricultural College, which was the collegiate predecessor of the University of Maryland at College Park. At that time, the Maryland Agricultural College was a semi-public institution, having both public and private stockholders, and one-half of its property was owned by the State, so that the appropriation to it is not, perhaps, a perfect legislative interpretation. However, in the same act, $5,000 was given for the construction of buildings at Charlotte Hall School, a privately owned institution, $5,000 for construction of St. Mary's Academy, a similar institution, and $175,000 for the purchase of a lot of ground in Baltimore for the Maryland Institute, also a private institution, and for the construction of a building thereon. This was followed in 1912 by Chapter 90 of that year, which provided for the issuance of $600,000 worth of the State's bonds, the proceeds of which were to be paid to the Johns Hopkins University

for the erection of a technological school. That act also included an annual appropriation for maintenance, and provided for scholarships, and it might possibly be argued that the scholarships constituted a consideration. However, in 1922, by Chapter 464, a general construction loan of $1,750,000 provided for a gift from the proceeds of $20,000 to St. John's College for a new heating plant, and $30,000 to Washington College for and on account of its indebtedness. In 1924, there were four acts passed. Chapter 274 authorized a St. John's College loan in the amount of $110,000, the proceeds of which were to pay the present indebtedness of the college. Chapter 280 created a state debt of $2,460,000, and of the proceeds $100,000 was given to St. John's College for equipment and necessary construction purposes. By Chapter 366, the Western Maryland College loan of $125,000 was created, to be turned over to the Board of Trustees of Western Maryland College for the construction and equipment of a science building. By Chapter 369, a state debt of $100,000 was authorized, proceeds to be given to the Board of Visitors and Governors of Washington College for equipment and construction. In 1927, by Chapter 666, the Morgan College loan of $125,000 was created, the proceeds to be used for the construction and equipment of an industrial science building at Morgan College, then a private institution, but later acquired by the State. In 1937, by Chapter 487, a general bond issue of $9,052,000 was authorized, of which $162,000 went for the construction of buildings at Bowie Normal School, and $25,000 for the construction of an improved water supply at the Maryland Training School for Boys. In 1929, by Chapter 263, a state debt of $50,000 was created, to be used for the payment of the deficit in constructing and equipping the new buildings at Charlotte Hall School. All of these recipients were private non-profit corporations.

The policy of the State's activities is a legislative question and not a judicial one. We are concerned only

with whether the method adopted is prohibited. "In the General Assembly plenary power to legislate is vested, unless restrained by the Constitution." *Kenneweg v. Allegany Co.,* 102 Md. 119, 123, 62 A. 249, 250. *Wyatt v. State Roads Commission, supra,* 175 Md. at p. 265, 1 A. 2d 619. In view of the many previous bond issues for similar purposes, it is quite late for us now to change the long continued legislative and executive construction of Sec. 34, and we think that construction is in line with the better reasoned authorities. Cash is not credit. Credit is sometimes a means of procuring cash, but the word is never used to describe a gift of cash. There is no prohibition in the Constitution against making appropriations to private institutions, provided the purpose is public, or semi-public, and thousands and thousands of dollars are appropriated out of the annual receipts every year. If the State should have a balance of a million and a half in its treasury from annual receipts, there could be no constitutional objection to its giving this amount to the Johns Hopkins University for the purpose of constructing an engineering building. If the State does not have this amount available, but borrows it and then gives the cash to the University, which is what it is attempting to do, it is not giving or loaning its credit to, or in aid of, the University—it is using its credit with banking institutions to borrow the money, and it is giving the University its cash. What the Legislature of 1951 did by Chapter 414 was not to do by indirection what was forbidden to be done directly—it was to do something entirely different, something not prohibited, something not within the purpose of the constitutional prohibition, not within its wording, and not within its previous long-continued interpretation. Every intendment must be resolved in favor of the constitutionality of an act of the Assembly. We must not try to find reasons to hold a law unconstitutional. If it is not clearly so, its constitutionality must be upheld. We think Chapter 414 was within the powers of the Legislature and was not prohibited by any constitutional provision.

So holding, we must reverse the decree of the chancellor which held otherwise.

*Decree reversed with costs and bill dismissed.*