In re MARRIAGE OF LAPPE, No. 81605.

NOTICE: Under Supreme Court Rule 367 a party has 21 days after the filing of the opinion

to request a rehearing. Also, opinions are subject to modification, correction or withdrawal at

anytime prior to issuance of the mandate by the Clerk of the Court. Therefore, because the

following slip opinion is being made available prior to the Court's final action in this matter,

it cannot be considered the final decision of the Court. The official copy of the following

opinion will be published by the Supreme Court's Reporter of Decisions in the Official

Reports advance sheets following final action by the Court.

                                    

               Docket No. 81605--Agenda 15--January 1997.

       In re MARRIAGE OF LARRY LAPPE and LYNN LAPPE, Appellee (The

             Illinois Department of Public Aid, Appellant).

                       Opinion filed May 1, 1997.

     JUSTICE BILANDIC delivered the opinion of the court:

     The appellant, the Illinois Department of Public Aid (the

Department), filed a motion to intervene in a dissolution action

pending between Larry and Lynn Lappe in the circuit court of

Madison County. The Department sought to intervene on behalf of

Larry Lappe, the custodial parent of the divorced couple's

unemancipated minor child, pursuant to sections 10--1 and 10--10 of

the Public Aid Code (305 ILCS 5/10--1, 10--10 (West 1994)). The

Department also filed a petition on Larry's behalf to establish a

child support obligation on the part of the appellee, Lynn Lappe.

Lynn filed objections to the Department's motion to intervene,

arguing that sections 10--1 and 10--10 of the Public Aid Code were

unconstitutional in that they violated the Illinois Constitution's

mandate that public funds be used only for public purposes. Ill.

Const. 1970, art. VIII, §1. The circuit court ultimately denied the

Department's motion to intervene, finding that the application of

these sections to allow intervention by the Department in this case

would constitute an unconstitutional use of public funds for a

purely private purpose. The Department appealed to the appellate

court and the appellate court transferred the appeal to this court

pursuant to Supreme Court Rule 302(a)(1) (134 Ill. 2d R.

302(a)(1)).

                                   FACTS

     Larry and Lynn Lappe were married on October 18, 1969. The

couple had two children, Chad and Nicholas. In 1989, both Lynn and

Larry filed petitions for dissolution of the marriage in the

circuit court of Madison County. On August 21, 1989, the circuit

court entered an order dissolving the marriage. The record reveals

that Larry filed for bankruptcy pursuant to chapter 7 of the United

States Bankruptcy Code on February 12, 1990. According to Larry's

bankruptcy schedules, he was then employed as the United States

Postmaster of Sorento, Illinois, and had gross earnings of $33,600

in 1989.

     On July 13, 1990, the circuit court entered a judgment of

dissolution of marriage which incorporated a marital settlement

agreement, a joint parenting order, and a qualified domestic

relations order regarding the division of Larry's interest in the

Civil Service Retirement System Pension Plan. The marital

settlement agreement stated that Larry would pay $523.22 per month

in child support, which amount would be adjusted if necessary. The

joint parenting order stated that the parties would have joint

custody of the two children, with Lynn having primary residential

custody.

     On February 8, 1991, the circuit court entered an order,

pursuant to an agreement of the parties, increasing Larry's child

support payments to $546.93 per month. Larry's child support

payments were again increased by agreement on February 5, 1992, to

$567.89 per month, based on a salary increase. On July 30, 1992, a

stipulated order was entered modifying Larry's child support

obligation to $504.83 per month, because of the emancipation of the

couple's older child, Chad.

     On March 16, 1993, the circuit court entered an order

modifying the judgment of dissolution of marriage, pursuant to the

parties' stipulation. This stipulated order provided that the

principal place of residence for the couple's minor child,

Nicholas, was changed from Lynn to Larry, commencing on March 1,

1993. The order provided that Larry's obligation to pay child

support to Lynn would cease, and that Lynn would not be obligated

to pay child support to Larry.

     On July 26, 1995, the Illinois Department of Public Aid, by

the Madison County State's Attorney, filed a motion to intervene on

behalf of Larry in the Lappe dissolution action. As grounds for

intervention, the Department stated that the Department "is

authorized to institute legal action on behalf of [Larry] for

judicial enforcement of [Lynn's] support liability, pursuant to 305

ILCS 5/10--10 and 5/10--3.1." On that same date, the Department

filed a petition to establish an obligation on the part of Lynn to

pay child support for Nicholas. On August 1, 1995, the circuit

court granted the Department's motion to intervene.

     On August 9, 1995, Lynn filed an objection to the Department's

motion to intervene. Lynn argued that the Department's motion

should be denied because she "believed" that Larry was not a

recipient of public aid and that he had a "large and sufficient

income (approximately $41,000.00 per year)." On August 29, 1995,

Lynn filed an amended objection to the Department's motion to

intervene. The amended objection argued that sections 10--1 and 10-

-10 of the Public Aid Code, from which the Department derived its

authority to intervene in this case, were unconstitutional. Lynn

contended that these provisions violated the separation of powers

doctrine contained in section 1 of article II of the Illinois

Constitution of 1970, and the mandate that public funds may be used

only for public purposes contained in section 1 of article VIII of

the Illinois Constitution of 1970.

     On April 3, 1996, the circuit court entered an order setting

aside its previous order granting the Department leave to intervene

and denied the Department leave to intervene. The circuit court

determined that the relevant statutory provisions authorized the

Department to intervene on behalf of Larry. The court found,

however, that the provisions violated the constitutional mandate

that public funds be used only for public purposes. The court

determined that there was no proper public purpose in the

Department's providing child support enforcement services to Larry

because Larry made $40,000 per year and was therefore able to

pursue child support from Lynn without the Department's assistance.

The circuit court rejected the contention that these provisions

violated the separation of powers doctrine. The circuit court's

order concluded as follows:

          "It is therefore ordered, that the statutory provisions

          relied upon and cited herein, while not unconstitutional

          in the absolute sense, would lead to an unconstitutional

          result in the instant case, and accordingly the Order of

          August 1, 1995 granting the State's Attorney leave to

          intervene is set aside, and said Motion for Leave to

          Intervene is denied."

The circuit court subsequently entered an order finding that there

was no just reason for delaying the appeal of its April 3, 1996,

order.

     The Department filed a notice of appeal to the appellate

court. The Department thereafter filed a motion in the appellate

court to transfer the appeal to this court pursuant to Supreme

Court Rule 302(a)(1), because the circuit court had held a

statutory provision unconstitutional. Lynn objected to the motion

to transfer. On August 9, 1996, the appellate court entered an

order transferring the appeal to this court.

                                 ANALYSIS

                               Jurisdiction

     Lynn challenges this court's jurisdiction over this appeal.

The Department argues that jurisdiction is proper in this court

pursuant to Supreme Court Rule 302(a)(1), because the circuit court

held that a state statute was unconstitutional. Supreme Court Rule

302(a)(1) provides for appeals to be taken directly to this court

from final judgments of circuit courts "in cases in which a statute

of the United States or of this State has been held invalid." 134

Ill. 2d R. 302(a). Lynn contends that the circuit court's order in

this case did not hold a statute unconstitutional but, rather, held

only that the statute was unconstitutional as applied in this case.

Lynn relies on this court's decision in Rehg v. Illinois Department

of Revenue, 152 Ill. 2d 504, 509 (1992), in which we noted that a

lower court order that "simply declares that application of [a]

statute would violate a particular defendant's constitutional

rights" is not directly appealable to this court pursuant to Rule

302(a).

     A narrow reading of the circuit court's order in this case

supports Lynn's argument. The order states that the statutory

provisions "would lead to an unconstitutional result in the instant

case." We must look, however, to the effect of the circuit court's

order to determine whether the order actually declared the

statutory provisions unconstitutional on their face. See Doe v.

Gainer, 162 Ill. 2d 15, 18 (1994). If the effect of the circuit

court's order was to declare a statute unconstitutional on its

face, this court has jurisdiction under Rule 302(a)(1). See Doe,

162 Ill. 2d at 18 (although circuit court's order stated that

statute was unconstitutional "as applied" to the plaintiff, effect

of order was to declare provision unconstitutional on its face and

jurisdiction under Rule 302(a)(1) was proper); First of America

Bank, Rockford, N.A. v. Netsch, 166 Ill. 2d 165, 169 (1995) (this

court assumed jurisdiction under Rule 302(a)(1) of appeal from

circuit court order which held that certain statutory provisions

were unconstitutional "as applied" to the plaintiff); People v.

Roos, 118 Ill. 2d 203 (1987) (this court assumed jurisdiction under

Rule 302(a)(1) of appeal from circuit court order which held that

a statute was unconstitutional "as applied" to the practice of

acupuncture); Miller v. Lockett, 98 Ill. 2d 478, 479-80 (1983)

(this court held that jurisdiction was proper under Rule 302(a)(1)

even though the circuit court did not directly state that the

statute was unconstitutional because it appeared from the order

that the circuit court found the statute invalid); Sommer v.

Village of Glenview, 79 Ill. 2d 383, 385-86 (1980) (this court held

that it had jurisdiction under Rule 302(a)(1) of appeal from

circuit court order which stated only that a particular statutory

provision could not be applied to home rule units because, in

effect, the circuit court order necessarily held that the statutory

provision was unconstitutional as applied to home rule units).

     The Department asserts that the effect of the circuit court's

order was to declare sections 10--1 and 10--10 of the Public Aid

Code, in part, unconstitutional on their face. We agree. The

circuit court ruled that sections 10--1 and 10--10 of the Public

Aid Code were unconstitutional as applied to Larry because, in the

court's opinion, Larry earned $40,000 per year and therefore was

capable of pursuing child support enforcement services without the

Department's assistance. As we discuss in detail later in this

opinion, however, sections 10--1 and 10--10 clearly grant the

Department the discretion to provide child support enforcement

services to any individual who applies for them, regardless of that

individual's financial capability to pursue enforcement privately.

Thus, Larry is within the class of recipients contemplated by the

statutory provisions. The trial court's ruling that the provisions

are unconstitutional as applied to Larry is therefore, in effect,

a ruling that the provisions are unconstitutional to the extent

they allow application to Larry and others who are "financially

capable." In effect, the circuit court declared portions of

sections 10--1 and 10--10 unconstitutional on their face. We

therefore have jurisdiction pursuant to Rule 302(a)(1).

                             Constitutionality

     We now turn to the substantive issue in this case: whether

sections 10--1 and 10--10 of the Public Aid Code, in allowing the

Department the discretion to provide child support enforcement

services to an individual who may be financially capable of

pursuing enforcement privately, serve a public purpose within the

meaning of article VIII, section 1, of the Illinois Constitution.

The argument that these provisions violate the separation of powers

doctrine has not been raised in this court.

     It is well established that legislative enactments enjoy a

heavy presumption of constitutionality. People ex rel. Sheppard v.

Money, 124 Ill. 2d 265, 272 (1988); County of Kane v. Carlson, 116

Ill. 2d 186, 216 (1987). The party challenging the

constitutionality of a statute has the burden of clearly

establishing its invalidity. People v. Adams, 149 Ill. 2d 331, 338

(1992); Bernier v. Burris, 113 Ill. 2d 219, 227 (1986). Courts have

a duty to sustain legislation whenever possible and resolve all

doubts in favor of constitutional validity. Adams, 149 Ill. 2d at

338; Sheppard, 124 Ill. 2d at 272.

     The statutory provisions at issue in this case govern the

Department's provision of child support enforcement services to

individuals who are not receiving public aid. These provisions are

part of a larger statutory scheme for the enforcement of child

support obligations, and a review of that statutory framework is

necessary to provide a proper context for these provisions. We

begin with the pertinent provisions of the federal Social Security

Act. 42 U.S.C. §301 et seq. (1994).

                            Social Security Act

     The federal welfare program known as Aid to Families with

Dependent Children (AFDC), contained in Title IV-A of the Social

Security Act, established a scheme under which the federal

government would reimburse states for a percentage of the funds

that states distributed to needy families with children. 42 U.S.C.

§601 et seq. (1994). States were not required to participate in the

AFDC program, but if a state chose to participate in the program,

it had to comply with the requirements of the Social Security Act

and the regulations promulgated thereunder. 42 U.S.C. §602 (1994);

King v. Bradley, 829 F. Supp. 989, 991 (N.D. Ill. 1993). Title IV-A

set out, in considerable detail, the elements which must be

included in a state AFDC plan. 42 U.S.C. §602 (1994). If a state

AFDC plan met with federal approval, the state was entitled to

reimbursement from the federal government of a substantial

percentage of the state funds it expended in AFDC payments. 42

U.S.C. §603(a) (1994).

     In 1974, Congress amended the Social Security Act by adding

Title IV-D. 42 U.S.C. §651 et seq. (Supp. 1975). Title IV-D

established a Child Support Enforcement Program, "[f]or the purpose

of enforcing the support obligations owed by absent parents to

their children." 42 U.S.C. §651 (1994). At the same time, Title IV-

A was amended to require states, as a condition of receiving

federal AFDC funds, to adopt child support enforcement programs

that complied with Title IV-D. 42 U.S.C. §602(a)(27) (1994).

Accordingly, in order for a state to obtain federal funding for its

AFDC program, the state was required to operate a child support

enforcement program in compliance with Title IV-D. 42 U.S.C.

§§602(a)(27), 603(h) (1994); see also People v. Sheppard, 124 Ill.

2d 265, 270 (1988); King v. Bradley, 829 F. Supp. 989, 991 (N.D.

Ill. 1993); Carelli v. Howser, 923 F.2d 1208, 1210 (6th Cir. 1991).

     A state program under Title IV-D must provide a variety of

services including establishment of paternity, establishment and

enforcement of support obligations, and parent locator services. 42

U.S.C. §652(a)(1) (1994); 45 C.F.R. §§303.3, 303.4, 303.5, 303.6

(1994). By operating a program of child support enforcement

services in compliance with Title IV-D, a state not only would

receive federal AFDC funding, but it would also be reimbursed by

the federal government for a large percentage, ranging from 66% to

90%, of the state funds it expends in connection with the Title IV-

D program. 42 U.S.C. §655 (1994). In addition, Title IV-D provides

for states to be paid incentive payments to "encourage and reward"

states which operate efficient enforcement programs. 42 U.S.C.

§658(b) (1994). The incentive payments will generally equal 6% of

the state's support collections in AFDC cases and 6% of the state's

support collections in non-AFDC cases in a particular year. 42

U.S.C. §658(b) (1994).

     Title IV-D provides detailed requirements with which a state

plan must comply in order for the state to be entitled to federal

funding. 42 U.S.C. §654 (1994). One of the requirements of Title

IV-D is that the state must make the same child support enforcement

services available to both families receiving AFDC and families who

are not receiving AFDC. 42 U.S.C. §654(6) (1994). The version of

section 654(6) applicable to this case provides, in pertinent

part,:

          "A State plan for child and spousal support must--

                                   * * *

               (6) provide that (A) the child support collection or

          paternity determination services established under the

          plan shall be made available to any individual not

          otherwise eligible for such services upon application

          filed by such individual with the State, *** (B) an

          application fee for furnishing such services shall be

          imposed, which shall be paid by the individual applying

          for such services, or recovered from the absent parent,

          or paid by the State out of its own funds, *** the amount

          of which (i) will not exceed $25 (or such higher or lower

          amount (which shall be uniform for all States) as the

          Secretary may determine to be appropriate for any fiscal

          year ***." 42 U.S.C. §654(6) (1994).

     The Office of Child Support Enforcement (OCSE), the federal

agency charged with administering the AFDC program, has promulgated

regulations to carry out the Title IV-D program. 45 C.F.R. §301 et

seq. (1994). In accordance with Title IV-D, the OCSE regulations

provide that states must make child support enforcement services

available to non-AFDC recipients. Regulation 302.33 provides, in

relevant part:

               "Services to individuals not receiving AFDC or title

          IV-E foster care assistance.

               (a) Availability of Services. (1) The State plan

          must provide that the services established under the plan

          shall be made available to any individual who:

               (i) Files an application for the services with the

          IV-D agency." 45 C.F.R. §302.33 (a)(1)(i) (1994).

     We note, for clarification purposes, that in late 1996,

Congress enacted the Personal Responsibility and Work Opportunity

Reconciliation Act of 1996, Pub. L. 104--193, 110 Stat. 2105

(Personal Responsibility Act). The Personal Responsibility Act

replaced the federal AFDC program contained in Title IV-A with a

program of block grants to states for Temporary Assistance for

Needy Families (TANF). Pub. L. 104--193, 110 Stat. 2112-13. TANF,

like AFDC, provides the states participating in the program with

federal funding for the states' programs of public assistance to

families with dependent children. Pub. L. 104--193, 110 Stat. 2134.

In order to be eligible for a block grant under the TANF program,

a state must still operate a child support enforcement program in

compliance with Title IV-D. Pub. L. 104--193, 110 Stat. 2114, 2198-

2200. The Personal Responsibility Act also amended some portions of

Title IV-D. However, Title IV-D still requires that a state program

must provide child support enforcement services to "any *** child,

if an individual applies for such services with respect to the

child." Pub. L. 104--193, 110 Stat. 2199.

                         Illinois Public Aid Code

     Illinois chose to participate in the federal AFDC program and

thereby receive federal funding for its public aid program. 305

ILCS 5/12--4.5 (West 1994); 89 Ill. Adm. Code §160.10(a) (1994);

see also King v. Bradley, 829 F. Supp. 989, 991 (N.D. Ill. 1993).

As a result, Illinois is required to operate a child support

enforcement program that complies with Title IV-D. 42 U.S.C.

§602(a)(27) (1994). Illinois' Title IV-D program is contained in

article X of the Public Aid Code and part 160 of the Department's

regulations. 305 ILCS 5/10--1 et seq. (West 1994); 89 Ill. Adm.

Code §160.1 et seq. (1994).

      Article X of the Public Aid Code states that its purpose is

to provide for locating an absent parent, for determining his or

her financial circumstances, and for enforcing his or her legal

obligation of support. 305 ILCS 5/10--1 (West 1994). The services

available under article X include (1) identifying and locating an

absent parent, (2) establishing parentage, (3) establishing support

obligations, (4) enforcing and collecting support, (5) receiving

and distributing support payments, and (6) maintaining accurate

records of location and support activities. 89 Ill. Adm. Code

§160.10(c) (1994). The Department may provide these services though

the use of either the administrative process or the court system.

305 ILCS 5/10--10, 10--11 (West 1994); 89 Ill. Adm. Code §160.10(d)

(1994). To establish a support obligation where a court has

previously acquired jurisdiction in a case, the Department refers

the case to the Attorney General or State's Attorney for judicial

action, which includes the preparation of petitions to intervene,

petitions to establish support obligations, and petitions to

modify. 305 ILCS 5/10--10, 10--3.1 (West 1994); 89 Ill. Adm. Code

§§160.60(e)(1), (e)(2) (1994).

     The provisions at issue in this case are contained in article

X and pertain to the provision of child support enforcement

services to non-AFDC recipients. In accordance with the federal

mandate of Title IV-D, article X provides that the child support

enforcement services provided thereunder shall be available to both

AFDC families and non-AFDC families. Section 10--1 provides, in

pertinent part:

               "At the discretion of the Illinois Department of

          Public Aid, the child and spouse support services

          established under this Article may also be furnished in

          behalf of spouses and dependent children who are not

          applicants for or recipients of financial aid under this

          Code. The Department may limit eligibility of these

          persons to designated income classes. If non-applicants

          and non-recipients are included, the Department may

          establish a schedule of reasonable fees, to be paid for

          the services provided and may deduct a collection fee,

          not to exceed 10% of the amount collected, from such

          collection. The Illinois Department of Public Aid shall

          cause to be published and distributed publications

          reasonably calculated to inform the public that

          individuals who are not recipients of or applicants for

          public aid under this Code are eligible for the child and

          spouse support services under this Article X." 305 ILCS

          5/10--1 (West 1994).

Section 10--10 specifically refers to the use of the court system

to provide child support enforcement services. In relevant part,

section 10--10 provides:

               "Actions may also be brought under this Section in

          behalf of any person who is in need of support from

          responsible relatives, *** who is not an applicant for or

          recipient of financial aid under this Code." 305 ILCS

          5/10--10 (West 1994).

     In the present case, the circuit court determined that

sections 10--1 and 10--10 authorized the Department to intervene

and file a petition to establish child support on behalf of Larry.

The court ruled, however, that, in so doing, the statutory

provisions violated the Illinois Constitution's mandate that public

funds be used only for public purposes. The circuit court found

that there was no public purpose in the "use of State funds to

provide a lawyer for a parent making $40,000 a year."

     We first note that the circuit court was correct in concluding

that the pertinent provisions of sections 10--1 and 10--10

authorize the Department to intervene on behalf of Larry in this

case. These provisions grant the Department the discretion to

provide child support enforcement services to any individual who

applies for such services, without regard to his or her financial

status. Section 10--1 states that the Department "may" limit

eligibility to designated income groups. 305 ILCS 5/10--1 (West

1994). Implicit in that statement is that the Department may choose

not to limit eligibility based on income. The Department

regulations state that, in accordance with Title IV-D, child

support enforcement services are available to "persons not

receiving [public aid], upon application to the Department for such

services." 89 Ill. Adm. Code §160.10(a)(9) (1996). The Department

regulations do not contain any provision limiting eligibility based

on income, and the parties do not direct our attention to any other

source for such limitation. The legislative history of section 10--

10 further supports the conclusion that the Department is granted

the discretion to provide child support enforcement services to any

individual, regardless of financial need. Prior to 1975, section

10--10 stated that actions for child support enforcement could be

brought by the Department "in behalf of any person in necessitous

circumstances who is in need of support from responsible

relatives." (Emphasis added.) Ill. Rev. Stat. 1973, ch. 23, §10--

10. When section 10--10 was amended in 1975, the phrase "in

necessitous circumstances" was deleted from that sentence, so that

the section would read, as it presently does, that actions could be

brought in behalf of "any person who is in need of support from

responsible relatives." The legislature deliberately omitted

financial need of the applicant as a restriction on the

Department's authority. Thus, the pertinent provisions of sections

10--1 and 10--10 clearly authorize the Department to intervene and

petition to establish child support on behalf of Larry.

     We must therefore determine whether the provision of child

support enforcement services to a non-aid recipient who may be

financially capable of pursuing such enforcement privately is a

public purpose within the meaning of article VIII, section 1, of

our state constitution. We agree with the Department that Lynn

failed to meet her burden of establishing that no public purpose is

served by the Department's provision of child support enforcement

services in this case.

                              Public Purpose

     Article VIII, section 1, of the Illinois Constitution of 1970

provides that "[p]ublic funds, property or credit shall be used

only for public purposes." Ill. Const. 1970, art. VIII, §1. This

court has long recognized that what is for the public good and what

are public purposes are questions which the legislature must in the

first instance decide. People ex rel. City of Salem v. McMackin, 53

Ill. 2d 347, 355 (1972); Cremer v. Peoria Housing Authority, 399

Ill. 579, 588 (1948). In making this determination, the legislature

is vested with a broad discretion, and the judgment of the

legislature is to be accepted in the absence of a clear showing

that the purported public purpose is but an evasion and that the

purpose is, in fact, private. Salem, 53 Ill. 2d at 355; People ex

rel. McDavid v. Barrett, 370 Ill. 478, 482 (1939); Hagler v. Small,

307 Ill. 460, 474 (1923). In the words of Justice Holmes, "a

declaration by a legislature concerning public conditions that by

necessity and duty it must know, is entitled at least to great

respect." Block v. Hirsh, 256 U.S. 135, 154, 65 L. Ed. 865, 870, 41

S. Ct. 458, 459 (1921).

     This court has previously set forth guidelines for this

inquiry:

          "In deciding whether such purpose is public or private,

          courts must be largely influenced by the course and usage

          of the government, the object for which taxes and

          appropriations have been customarily and by long course

          of legislation levied and made, and what objects have

          been considered necessary to the support and for the

          proper use of the government. Whatever lawfully pertains

          to this purpose and is sanctioned by time and the

          acquiescence of the people may well be said to be a

          public purpose and proper for the maintenance of good

          government." Hagler, 307 Ill. at 474.

What is a "public purpose" is not a static concept, but is flexible

and capable of expansion to meet the changing conditions of a

complex society. People ex rel. Adamowski v. Chicago R.R. Terminal

Authority, 14 Ill. 2d 230, 236 (1958); People v. Chicago Transit

Authority, 392 Ill. 77, 86 (1945). Moreover, " `[t]he power of the

State to expend public moneys for public purposes is not to be

limited, alone, to the narrow lines of necessity, but the

principles of wise statesmanship demand that those things which

subserve the general wellbeing of society and the happiness and

prosperity of the people shall meet the consideration of the

legislative body of the State, though they ofttimes call for the

expenditure of public money.' " Salem, 53 Ill. 2d at 357-58,

quoting Hagler, 307 Ill. at 475. The consensus of modern

legislative and judicial thinking is to broaden the scope of

activities which may be classified as involving a public purpose.

Salem, 53 Ill. 2d at 356; see also Marshall Field & Co. v. Village

of South Barrington, 92 Ill. App. 3d 360, 366 (1981).

     The Department argues that the pertinent portions of sections

10--1 and 10--10 serve a public purpose by advancing the welfare of

children. We agree. The provision of child support enforcement

services on behalf of all dependent children serves a public

purpose by promoting the right of children to be supported by their

parents, fostering parental responsibility and involvement, and

preventing families from becoming dependent on welfare.

     This court has recognized that Illinois has a strong interest

in preserving and promoting the welfare of children. People ex rel.

Sheppard v. Money, 124 Ill. 2d 265, 277 (1988). In this regard,

this court has noted that "[a] parent's duty to support his or her

minor child is among the oldest principles of law." Sheppard, 124

Ill. 2d at 269-70, citing 1 W. Blackstone, Commentaries *446-47.

"Indeed, it is difficult to imagine a more compelling State

interest than the support of children." Sheppard, 124 Ill. 2d at

277. As described above, the Illinois child support enforcement

program provides assistance to custodial parents in locating absent

parents, establishing parentage, and establishing, enforcing and

collecting support obligations. The provision of these services

clearly serves the public purpose of advancing the welfare of

children by enforcing a child's right to be supported by his

parents, fostering parental responsibility and parental involvement

with the child, and preventing the child and custodial parent from

having to turn to welfare.

     This public purpose is served by the extension of these

services to all children, regardless of the financial circumstances

of their custodial parents. All children have the right to be

supported by their parents, and are benefitted, both financially

and otherwise, when an absent parent provides support. The

legislature could rightly determine that a public purpose is served

by providing an effective program of child support enforcement that

is available on behalf of all children with an absent parent. The

focus of this legislation is on effective enforcement. The

provisions simply create a mechanism whereby custodial parents of

dependent children can, with minimal time and expense, obtain

assistance with the paperwork involved in child support

enforcement, with locating the person obligated to pay support and

with taking the necessary steps, including judicial action, to

ensure that the proper amount of money is collected. As one article

describes it, "with the help of IDPA potentially available in

virtually all cases, custodial parents can tap various resources

that allow for effective enforcement." D. Bergbreiter & A. McKay,

Child Support Enforcement and the Illinois Department of Public

Aid, 81 Ill. B.J. 638, 643 (1993).

     Our precedent supports the conclusion that a public purpose is

served by the legislation challenged in this case. In Board of

Education, School District No. 142 v. Bakalis, 54 Ill. 2d 448

(1973), this court found that a public purpose was served by a

provision of the School Code which required school boards to

provide free transportation to school to nonpublic school students.

The plaintiff challenged the statute, arguing that it violated

article VIII, section 1, of the Illinois Constitution of 1970

because it constituted the use of public funds for a nonpublic

purpose. This court rejected that argument, finding that the

transportation of school children, public or nonpublic, is a public

purpose. Bakalis, 54 Ill. 2d at 466. The enforcement of a child's

legal right to support from their parent must be considered at

least as beneficial to the public good as the transportation of

children to school.

     In addition, it is important to note that these provisions

were included in our Public Aid Code in order to comply with Title

IV-D of the Social Security Act. It is appropriate to look at the

purposes sought to be achieved by Congress in requiring that states

include these provisions. One purpose of Title IV-D was to decrease

welfare costs by collecting child support owed by noncustodial

parents whose dependent children were receiving public aid. See S.

Rep. No. 93--1356, 93d Cong., 2d Sess., reprinted in 1974

U.S.C.C.A.N. 8133, 8145-47. Title IV-D, however, expressly requires

that child support enforcement services be provided to non-AFDC

families who make application for such services. The legislative

history of Title IV-D reveals dual purposes behind the extension of

child support enforcement services to non-AFDC families. One

purpose was to reduce welfare costs by preventing families from

becoming dependent on public aid as a result of unpaid child

support. S. Rep. No. 93--1356, 93d Cong., 2d Sess., reprinted in

1974 U.S.C.C.A.N. 8133, 8145-47. The legislative history, however,

reveals that Title IV-D was also aimed at the broader goal of

assuring that all children will obtain assistance in securing child

support regardless of their circumstances.

     In recommending passage of Title IV-D in 1974, the Senate

finance committee noted that "the enforcement of child support

obligations is not an area of jurisprudence about which this

country can be proud," and that Title IV-D was designed to help

"all children" receive the support from absent parents that was

their right. S. Rep. No. 93--1356, 93d Cong., 2d Sess., reprinted

in 1974 U.S.C.C.A.N. 8133, 8145-46. Further, in 1984, Congress

amended Title IV-D to strengthen the effectiveness of the program

and to clarify that its purpose was to provide assistance in

securing child support to all children "regardless of their

circumstances." S. Rep. No. 98--387, 98th Cong., 2d Sess.,

reprinted in 1984 U.S.C.C.A.N. 2397, 2397. To that end, the 1984

amendments added language to the purpose clause of Title IV-D so

that it would specifically state that its purpose was to assure

assistance in obtaining support "to all children *** for whom such

assistance is requested." 42 U.S.C. §651 (1994). This purpose was

also emphasized in the recent amendments to Title IV-D made by the

Personal Responsibility Act of 1996. In explaining the amendments

to Title IV-D, the House report stated that:

          "because millions of families are at risk of needing

          public welfare unless noncustodial parents provide child

          support, and because additional millions of families are

          not receiving the financial support that is their legal

          right from noncustodial parents, States must provide

          child support services to nonwelfare families that

          request such services." (Emphasis added.) H.R. Rep. No.

          104--651, 104th Cong., 2d Sess., reprinted in 1996

          U.S.C.C.A.N. 2380, 2456.

     In addition, we note that other states have enacted statutes

which provide, in accordance with Title IV-D, that the same child

support enforcement services must be provided to both AFDC families

and non-AFDC families. See Cabinet for Human Resources v. Houck,

908 S.W.2d 673 (Ky. 1995); Thaysen v. Thaysen, 583 So. 2d 663 (Fla.

1991); Worth v. Superior Court, 207 Cal. App. 3d 1150, 255 Cal.

Rptr. 304 (1989); Jeske v. Jeske, 144 Wis. 2d 364, 424 N.W.2d 196

(1988); Krogstad v. Krogstad, 388 N.W.2d 376 (Minn. 1986); Carter

v. Morrow, 562 F. Supp. 311 (W.D.N.C. 1983). Several courts in

other states have addressed the issue of whether it is a violation

of Title IV-D for a state to limit eligibility for child support

enforcement services to non-AFDC recipients who are financially

incapable of pursuing enforcement privately. Those courts have held

that Title IV-D requires that states provide child support

enforcement services to all custodial parents who apply for such

services, regardless of the parent's financial circumstances. See

State v. Wagner, 136 Wis. 2d 1, 400 N.W.2d 519 (1986); Thurman v.

Commonwealth of Kentucky, Cabinet for Human Resources, 828 S.W.2d

368 (Ky. 1992); South Carolina Department of Social Services v.

Deglman, 290 S.C. 542, 351 S.E.2d 864 (1986).

     Further, the legislation challenged here has been in existence

in this state for over 20 years. In determining whether a statute

serves a public purpose, a court "may take into consideration a

long course of legislation and usage of the government." Barrett,

370 Ill. at 485; Hagler, 307 Ill. at 474. The pertinent portions of

sections 10--1 and 10--10 have been in effect, in substantially

their present form, since 1975. Thus, for over 20 years, the

Department has possessed the authority to provide child support

enforcement services to non-AFDC families, regardless of their

financial circumstances. A Department report indicates that since

the Department began enforcing child support orders in 1976, the

Department has collected more than $1.4 billion for the children of

Illinois. Illinois Department of Public Aid Biennial Report, Fiscal

Years 1993-1994, at 10. Department reports also indicate that in

fiscal year 1995, the Department's child support enforcement

program had an active client caseload of 495,833 clients, of which

243,551 were non-AFDC clients, and the Department collected a total

of $241 million in support, with $164.6 million coming from non-

AFDC case collections. Illinois Department of Public Aid Human

Services Plan, Fiscal Years 1994, 1995, 1996, at 109. For fiscal

year 1996, it was estimated that total support collections would

equal $270.5 million, with $185.5 million coming from non-AFDC

cases. Illinois Department of Public Aid Human Services Plan,

Fiscal Years 1994, 1995, 1996, at 109.

     In view of the foregoing, it is clear that our legislature,

the legislatures of other states, and Congress have all determined

that the provision of effective child support enforcement services

on behalf of all children, regardless of the financial

circumstances of their parents, is an important governmental goal.

It is uniquely within the province of these legislative bodies to

make these determinations of governmental policy. Hagler, 307 Ill.

at 474. Our only permissible inquiry is whether the legislature's

determination is constitutionally permissible. We find no

constitutional basis for overturning the judgment of our

legislature on this issue.

     Lynn contends, however, that the legislation challenged here

does not serve any public purpose, but serves only to provide a

private benefit to Larry in the form of free legal services. This

is not an accurate characterization. The Department's child support

enforcement services are being provided for the benefit of the

Lappes' dependent child, not the custodial parent. Child support

payments are intended to go directly for the benefit of the child.

In re Marriage of Pihaly, 258 Ill. App. 3d 851, 856 (1994).

Moreover, article X specifically negates the contention that the

purpose of these provisions is to provide free legal representation

to custodial parents. Section 10--3.1 provides that "[a]n attorney

who provides representation pursuant to this Section shall

represent the Illinois Department exclusively *** [and] an

attorney-client relationship does not exist *** between that

attorney and *** an applicant for or recipient of child and spouse

support services ***." 305 ILCS 5/10--3.1 (West 1994). The fact

that Larry may be incidentally benefitted by the provision of these

services does not destroy the public nature of the legislation.

This court has recognized that "[t]he execution of a public purpose

which involves the expenditure of money is usually attended with

private benefits." Hagler, 307 Ill. at 473. If the principal

purpose of the enactment is public in nature, it is irrelevant that

there will be an incidental benefit to private interests. Salem, 53

Ill. 2d at 355; Adamowski, 14 Ill. 2d at 236.

      Lynn also takes the position that non-AFDC individuals should

be charged a fee for the enforcement services provided under this

legislation and that, absent such a fee, the provisions are

unconstitutional. We note first that the Department regulations

require that non-AFDC applicants for services pay an application

processing fee not to exceed $25. 89 Ill. Adm. Code §160.15 (1994).

Although the record is silent on this issue, we assume that this

fee was charged to Larry, as he was required, under the

regulations, to file an application with the Department to obtain

these services. 89 Ill. Adm. Code §160.10(a)(9) (1996). Apparently

then, Lynn's contention is that fees in addition to the application

fee are required to be charged to Larry if the statutory provisions

are to be constitutional.

      Section 10--10.1 of our Code directs that, where services are

provided on behalf of a non-aid recipient, under certain

circumstances a collection fee shall be collected from the person

who owes the support obligation. 305 ILCS 5/10--10.1 (West 1994).

Further, section 10--1 of the Code grants the Department discretion

to establish a reasonable schedule of fees and to deduct a

collection fee, not to exceed 10% of the amount collected, from the

support collected. 305 ILCS 5/10--1 (West 1994). Other than the

application processing fee, the Department regulations do not set

forth a plan for additional fees or other cost recovery from the

applicant for services. The parties do not direct our attention to

any other source for such additional fees to be recovered from the

applicant. Thus, our statutory scheme does not provide for the

imposition of a fee, beyond the application processing fee, to be

imposed upon non-AFDC applicants for support enforcement services.

Nevertheless, we fail to see how the Department's decision whether

to impose a fee for the services provided impacts on whether the

legislation serves a public purpose.

     Lynn also urges this court to affirm the circuit court because

the parties had, two years earlier, stipulated that Lynn would not

pay child support, the court entered an order pursuant to that

stipulation, and there is no claim that there has been any change

in circumstances warranting that Lynn now be ordered to pay child

support. All of these circumstances, however, pertain to the merits

of the petition to establish a child support obligation on the part

of Lynn. Due to the circuit court's denial of the motion to

intervene, the merits of that petition were never reached. The only

issue before this court is whether the circuit court erred in

denying the Department leave to intervene, and none of these

circumstances are relevant to that issue.

     In conclusion, we find no reason to overturn the legislature's

determination that a public purpose is served by the provision of

child support enforcement services on behalf of all children,

regardless of the financial circumstances of their custodial

parent. Child support enforcement in this country has, in the past,

been a national disgrace, due both to the lack of effective

enforcement programs and the failure to implement those programs by

the officials charged with enforcement. See S. Rep. No. 93--1356,

93d Cong., 2d Sess., reprinted in 1974 U.S.C.C.A.N. 8133, 8145-49;

People v. Sheppard, 124 Ill. 2d 265, 270 (1988). It was the

legislature's province to assess this crisis and determine whether,

and how, to respond. We are not persuaded that the legislature

exceeded the bounds of its discretion in enacting the legislation

here challenged.

                                CONCLUSION

     For the foregoing reasons, we reverse the circuit court's

order which held sections 10--1 and 10--10 of the Public Aid Code

unconstitutional and denied the Department's motion to intervene.

This cause is remanded to the circuit court for further proceedings

not inconsistent with this opinion.

Reversed and remanded.

                                                                         

     JUSTICE FREEMAN, dissenting:

     Jurisdiction is the cornerstone of the entire judicial

process; without it, courts have no power to decide the merits of

a controversy. The absence of jurisdiction is so serious that it is

one of the few defects which cannot be waived even by consent of

all the parties. As a result, courts themselves, at every level,

have an obligation to raise the lack of jurisdiction sua sponte and

to dismiss a pending action whenever it becomes apparent that

jurisdiction does not exist. Accordingly, jurisdiction is not a

fiction which can be created out of whole cloth. It cannot be

manufactured, nor can its limitations be circumvented merely to

suit the exigencies of the moment. Yet that is precisely what the

majority does today. Because I cannot concur in my colleagues'

invocation of jurisdiction in this case, I must respectfully

dissent.

     This court has long recognized the distinction between a

statute which is unconstitutional on its face and a statute which

is unconstitutional as applied. In the former situation, the

provision itself is invalid from its inception and has no force and

effect upon any person or entity. In contrast, when a statute is

deemed unconstitutional as applied, the statute itself is not

invalid, but is simply not applied to a particular case because to

do so would violate some superior constitutional right. This

distinction is critical, particularly with respect to this court's

authority to entertain an appeal under Supreme Court Rule 302(a)

(134 Ill. 2d R. 302(a)). That rule specifically limits our direct

appellate jurisdiction to only those cases in which "a statute of

the United States or of this State has been held invalid."

(Emphasis added.) 134 Ill. 2d R. 302(a). It is precisely because

Rule 302(a) speaks in terms of invalidity, as opposed to

application, that this court will not ordinarily entertain direct

appeals in cases involving an "as applied" determination. Thus, in

Rehg v. Illinois Department of Revenue, 152 Ill. 2d 504, 508-09

(1992), we held that an appeal from an order which does not declare

a statute unconstitutional on its face, but simply declares that

the application of the statute would violate a particular

defendant's constitutional right, "is properly brought in the

appellate court pursuant to Rule 301." Rehg, 152 Ill. 2d at 509. In

support of that conclusion, we stressed that "[s]uch an [as

applied] order does not declare a statute unconstitutional," nor

does it "invalidate" the statute for purposes of Rule 302(a). Rehg,

152 Ill. 2d at 509. We ultimately reached the merits of the

controversy in Rehg under Rule 302(a), but only because the circuit

court had also declared the Tax Act "unconstitutional on its face."

Rehg, 152 Ill. 2d at 509. The circuit court did not make such a

ruling in this case.

     In the present case, the circuit court declared sections 10--1

and 10--10 of the Public Aid Code unconstitutional as applied.

Specifically, the circuit court held:

               "It is therefore ordered, that the statutory

          provisions relied upon and cited herein, while not

          unconstitutional in the absolute sense, would lead to an

          unconstitutional result in the instant case, and

          accordingly the Order of August 1, 1995 granting the

          State's Attorney leave to intervene is set aside, and

          said Motion for Leave to Intervene is denied."

Consequently, because the circuit court did not find sections 10--1

and 10--10 facially unconstitutional, but only found that the

provisions would, in some way, lead to an "unconstitutional result"

as applied, this court lacks direct appellate jurisdiction under

Rule 302(a), as interpreted in Rehg.

     Notwithstanding the above, the majority declares that it "must

look, however, to the effect of the circuit court's order to

determine whether the order actually declared the statutory

provisions unconstitutional on their face" for "[i]f the effect of

the circuit court's order was to declare a statute unconstitutional

on its face, this court has jurisdiction under Rule 302(a)(1)."

Slip op. at 4. Applying this rationale, the majority concludes that

sections 10--1 and 10--10 were, "in effect," unconstitutional on

their face despite the fact that the circuit court had clearly

ruled that they were unconstitutional as applied. Slip op. at 6. My

colleagues reach this conclusion because, in their view, the

circuit court's order could be applied to any person "financially

capable" of pursuing child support without the assistance of the

Department. Slip op. at 6. I find this conclusion untenable.

     I recognize, of course, that a determination that a statute is

"unconstitutional as applied" may, under certain rare

circumstances, be deemed a "de facto" declaration of the statute's

invalidity for purposes of Rule 302(a). That situation, however,

occurs only when the "as applied" ruling--although nominally

pertaining to a particular person or set of persons--has the effect

of rendering the statute unconstitutional as to all persons under

all circumstances. For example, in Doe v. Gainer, 162 Ill. 2d 15

(1994), we entertained a direct appeal under Rule 302(a) from an

order declaring certain sections of the Uniform Code of Corrections

unconstitutional as applied to a particular inmate. We did so

because that particular inmate was representative of all inmates

who could be affected by the statute in question. Thus, the "as

applied" ruling was, for all intents and purposes, the functional

equivalent of a ruling that the statute was facially

unconstitutional. In contrast to Doe, the circuit court's ruling in

this case is only applicable to those individuals "financially

capable" of pursuing child support without assistance from the

Department. It is not applicable, however, to individuals who are

"financially incapable" of pursuing such support. In fact, those

persons may still receive Department assistance under sections 10--

1 and 10--10, which remained valid as to them. Hence, because the

provisions at issue remained valid as to some people, rather than

"invalid" as to all people, we do not have direct appellate

jurisdiction under Rule 302(a).

     Significantly, the majority today fails to explain how an "as

applied" ruling which is applicable to less than 100% of the

persons contemplated by the statute constitutes the functional

equivalent of facial declaration of invalidity. The majority also

fails to explain what percentage of those persons must be so

characterized in order for the circuit court's ruling to be viewed

as "in effect" a declaration of unconstitutionality on its face.

Nor does the majority explain how this court (or the appellate

court, for that matter) will ever be able to determine when that

number is great enough to warrant this court's direct appellate

review. Indeed, I simply cannot fathom how such a determination can

be undertaken--short of requiring parties in future cases to supply

the reviewing court with statistical data which can establish the

number of citizens potentially impacted by the "as applied"

determination.

     In view of these uncertainties, I am troubled by what I

perceive to be the majority's nonchalant invocation of jurisdiction

in this case. As I noted at the outset of this dissent,

jurisdiction is not a matter of judicial convenience, but the very

basis of a court's authority to decide the merits of a case. The

majority offers little analysis in support of its decision to

convert the circuit court's "as applied" order in this case into a

de facto declaration of invalidity for purposes of Rule 302(a). It

offers even less guidance for determining when circumstances exist

which justify making such a conversion. In fact, in failing to

recognize this shortcoming, my colleagues have unnecessarily

blurred the critical distinction between an "as applied"

determination and a facial determination.

     Finally, I view today's interpretation of Rule 302(a) as not

only unfortunate, but unnecessary as well. We are not confronted

here with a situation where the controversy might remain unresolved

absent action by this court. Jurisdiction to hear this appeal

remains with the appellate court pursuant to Supreme Court Rule 301

(155 Ill. 2d R. 301). Furthermore, once the appellate court issues

its decision, this court may grant further review under Supreme

Court Rule 315 (155 Ill. 2d R. 315). The appellate court could even

certify the matter for our review pursuant to Supreme Court Rule

316 (155 Ill. 2d R. 316). In view of these potentialities, I

consider the majority's decision, with all its attendant

consequences, to be both unwarranted and improvident.

     For all of the foregoing reasons, I respectfully dissent.

     JUSTICE McMORROW joins in this dissent.